IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

AGDAAGUX TRIBE OF KING COVE, et al.,  )
  )
      Plaintiffs,  )
  )
     and  )
  )
STATE OF ALASKA,  )
  )
      Intervenor-Plaintiff,  )
  )
     v.  )    No. 3:14-cv-0110-HRH
  )
SALLY JEWELL, Secretary of the Department  )
of Interior, et al.,  )
  )    <u>O R D E R</u>
      Defendants,  )
  )    <u>Motions to Dismiss</u>
     and  )
  )
FRIENDS OF ALASKA NATIONAL  )
WILDLIFE REFUGES, et al.,  )
  )
      Intervenor-Defendants.  )
_____)

Defendants move to dismiss certain portions of plaintiffs' complaint,[1] and

defendants also move to dismiss intervenor-plaintiff's complaint in its entirety.[2]

_____

[1]Docket No. 44.

[2]Docket No. 45.

Intervenor-defendants join in the motions to dismiss.[3]  The motions to dismiss are

opposed.[4]  Oral argument was requested and has been heard.

## Background

Plaintiffs are the Agdaagux Tribe of King Cove, the Native Village of Belkofski, the

King Cove Corporation, the Aleutians East Borough, the City of King Cove, Etta Kuzakin,

and Leff Kenezuroff.  Intervenor-plaintiff is the State of Alaska.  Defendants are Sally

Jewell, the Secretary of the Department of Interior; Kevin Washburn, Assistant Secretary

for Indian Affairs; Michael J. Bean, Acting Assistant Secretary for Fish Wildlife and Parks;

Dan Ashe, Director, United States Fish and Wildlife Service; Geoff Haskett, Regional

Director, United States Fish and Wildlife; and Doug Damberg, Manager, Izembek National

Wildlife Refuge.  Intervenor-defendants are Friends of Alaska National Wildlife Refuges,

Defenders of Wildlife, Wilderness Watch, Center for Biological Diversity, The Wilderness

Society, the National Audubon Society, the National Wildlife Refuge Association, and the

Sierra Club.

The City of King Cove ("King Cove") is located on the Alaska Peninsula, which

separates the Pacific Ocean from Bristol Bay, an arm of the Bering Sea.  King Cove has 938

---

[3]Docket No. 47.

[4]Docket No. 51.

residents, of whom more than one third are Alaska Natives.[5]  King Cove is one of the communities within the Aleutians East Borough.  Another community within the Borough is Cold Bay.  Cold Bay is a small community located approximately 18 miles from King Cove and home to the only all-weather airport in the vicinity of King Cove.  Both King Cove and Cold Bay are accessible only by air and sea.

King Cove and Cold Bay are both located within the Izembek National Wildlife Refuge, which was established in 1980 as part of the Alaska National Interest Lands Conservation Act (ANILCA).  The Izembek National Wildlife Refuge was established

> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonoids;
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
> (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
> (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

Pub. L. 96-487 (HR 39), Title III § 303(3) (Dec. 2, 1980).  "The Izembek Wildlife Refuge is important largely to the millions of waterfowl and shorebirds which rest and feed there for several months during spring and fall migrations."  S. Rep. 96-413 at 221-222 (1979), reprinted in 1980 U.S.C.C.A.N. 5070 at 5165-66 (1980).  "The world-famous eelgrass beds

---

[5]Complaint [etc.] at 4, ¶ 7, Docket No. 1.

of the Izembek Lagoon ... attract the largest concentration of migratory birds.  At times the entire world population of several species such as black brant and emperor geese can be found in these areas."  Id. at 179.  The Refuge is also home to "abundant brown bears, caribou and wolves" and "[b]etween 10,000 to 15,000 sea otters inhabit the waters off Izembek."  Id. at 222.  "Ringed, bearded, harbor and fur seals, walrus, beluga whales and porpoises also frequent these waters."  Id.  "Four species of salmon, dolly vardena and rainbow trout inhabit streams and lakes and king crabs, halibut and razor clams are abundant in lagoons and offshore waters."  Id.

For years, "[t]he idea of a road connecting King Cove and Cold Bay has been discussed...."[6]  Such a road would "enhance" King Cove residents' "access to Cold Bay and its all-weather airport, for personal safety, medical, and health purposes."[7]  Plaintiffs allege that "[t]he road would provide safe, reliable, and affordable access from King Cove to the Cold Bay Airport to allow medical evacuations from King Cove to Anchorage, particularly when wind and wave conditions make air and boat travel dangerous or highly uncomfortable for medical evacuees."[8]

---

[6]Complaint [etc.] at 7, ¶ 18, Docket No. 1.

[7]Id.

[8]Id. at 8, ¶ 22.  Plaintiffs allege that "[e]leven persons have been killed since 1980 while traveling during bad weather from King Cove to the Cold Bay airport and from Cold Bay and Kodiak to King Cove.  Id. at ¶ 23.

"In 1999 Congress passed the King Cove Health and Safety Act (Section 353) of the Consolidated and Emergency Supplemental Appropriations Act of 1999 (Public Law 105-277)...."[9] Under the Act, "$20 million was provided to construct a road-hovercraft link between King Cove and Cold Bay, $15 million was for improvements to the King Cove airstrip, and $2.5 million was for a major renovation of the King Cove health clinic."[10] "In 2006, the Aleutians East Borough constructed a one-lane gravel road from the King Cove airstrip to a temporary hovercraft dock four miles away where a hovercraft ... carrie[d] up to 49 passengers, an ambulance, and cargo to and from Cold Bay."[11] "This marine-road system was the preferred alternative evaluated in a 2003 Final Environmental Impact Statement completed by the Army Corps of Engineers."[12] "King Cove residents, however, continue[d] to seek a road linking their community with Cold Bay due to concerns about the reliability of the hovercraft in severe weather and uncertainty about future funding for

---

[9] Id. at 7, ¶ 19.

[10] Izembek and Alaska Peninsula Refuge and Wilderness Enhancement Act of 2007: Hearing on S. 1680 Before the Subcomm. on Public lands and Forests of the U.S. Senate Committee on Energy and Natural Resources (113th Cong. 2008) (testimony of Henri Bisson, Acting senior advisor to the Secretary for Alaska Affairs, Department of the Interior).

[11] Id.

[12] Id.

the operational costs associated with the hovercraft."[13]  And in fact, the hovercraft service was discontinued in 2011 by the Borough due to "cost and reliability concerns[.]"[14]

"In 2009 Congress passed the Omnibus Public Land Management Act of 2009 (Public Law 111-11), Title VI, Subtitle E (OPLMA)...."[15]  The OPLMA "authorized the Secretary of the Interior to exchange lands within the Izembek National Wildlife Refuge for lands owned by the State of Alaska and the King Cove Corporation for the purpose of constructing a single lane gravel road between the communities of King Cove and Cold Bay, Alaska."[16]  More specifically, Section 6402(a) of the OPLMA provided:

> Upon receipt of notification by the State and the Corporation of the intention of the State and the Corporation to exchange the non-Federal land for the Federal land, subject to the conditions and requirements described in this subtitle, the

---

[13]Id.

[14]Record of Decision at 6.  "'In considering a Rule 12(b)(6) motion, a district court generally may not take into account material beyond the complaint.'"  Dunn v. Castro, 621 F.3d 1196, 1205 n.6 (9th Cir. 2012) (quoting Intri–Plex Technologies, Inc. v. Crest Group, Inc., 499 F.3d 1048, 1052 (9th Cir. 2007)).   "However, ... [u]nder the 'incorporation by reference' doctrine, [the court] may consider 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  Id. (quoting Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) ).  Plaintiffs quote from and make reference to the Record of Decision in their complaint.

[15]Complaint [etc.] at 8, ¶ 20, Docket No. 1.

[16]Record of Decision at 6.  The proposed land exchange was "206 acres of federal land in the Izembek National Wildlife Refuge for 56,393 acres of State of Alaska and King Cove Corporation owned land[.]"  Complaint [etc.] at 5, ¶ 12(a), Docket No. 1.

> Secretary may convey to the State all right, title, and interest of the United States in and to the Federal land. The Federal land within the Refuge shall be transferred for the purpose of constructing a single-lane gravel road between the communities of King Cove and Cold Bay, Alaska.

Pub. L. 111-11, Title VI, Subtitle E, § 6402(a). The OPLMA provided that the road "shall be used primarily for health and safety purposes (including access to and from the Cold Bay Airport)...." Id. § 6403(a)(1)(A).

The Secretary was required to comply with the National Environmental Policy Act of 1969 (NEPA) and "any other applicable law (including regulations)" "[i]n determining whether to carry out the land exchange...." Id. § 6402(b)(1). Any NEPA analysis was to contain--

> (i) an analysis of--

>> (I) the proposed land exchange; and

>> (II) the potential construction and operation of a road between the communities of King Cove and Cold Bay, Alaska; and

>> (ii) an evaluation of a specific road corridor through the Refuge that is identified in consultation with the State, the City of King Cove, Alaska, and the Tribe.

Id. § 6402(b)(2)(B). The OPLMA provided that certain entities "may participate as ... cooperating" agencies "[d]uring the preparation of the environmental impact statement...." Id. § 6402(b)(3)(A). Entities entitled to participate as cooperating agencies included the

State, the Aleutians East Borough, the City of King Cove, and the Agdaagux Tribe.  Id. §

6402(b)(3)(B).

The OPLMA set forth certain conditions for the land exchange.  It provided that "to

carry out the land exchange ..., the Secretary shall determine that the land exchange

(including the construction of a road between the City of King Cove, Alaska and the Cold

Bay Airport) is in the public interest."  Id. § 6402(d)(1).  The OPLMA further provided that

> [t]he Secretary may not, as a condition for a finding that the land exchange is in the public interest--
>
> (A)  require the State or the Corporation to convey additional land to the United States; or
>
> (B)  impose any restriction on the subsistence uses (as defined in Section 803 of the Alaska National Interest Lands Conservation Act (16 U.S.C. § 3113)) of waterfowl by rural residents of the State.

Id. § 6402(d)(2).

After the OPLMA was enacted, at the direction of the Secretary, the United States

Fish and Wildlife Service prepared an environmental impact statement (EIS), the final

version of which was published on February 5, 2013.  The EIS analyzed the impacts of five

alternatives:  a no action alternative, two road construction alternatives, a hovercraft

alternative, and a ferry alternative.

On March 21, 2013, the Secretary directed Kevin Washburn, the Assistant Secretary of Interior for Indian Affairs, to examine the pending final decision.[17] "Pursuant to the unique trust relationship" between the United States and Native tribes, Washburn was to "visit King Cove to hold additional government-to-government consultations" with the Agdaagux Tribe, the Belkofski Tribe, and the King Cove Corporation.[18] Washburn visited the King Cove area on June 26-29, 2013[19] and prepared a report that was dated October 28, 2013.

On December 23, 2013, the Secretary published the Record of Decision (ROD).[20] "[T]he Department ... decided to adopt the 'no action' alternative in the EIS. This alternative declines the offered land exchange for road construction and includes a description of a proposal for a landing craft/passenger ferry that could use the road that has been constructed to the Northeast Terminal on the border of the Refuge."[21] The Secretary explained that

> [t]he EIS shows that construction of a road through the Izembek National Wildlife Refuge would lead to significant degradation of irreplaceable ecological resources that would

---

[17]Complaint [etc.] at 10, ¶ 29, Docket No. 1.

[18]Id.

[19]Id. at 11, ¶ 30.

[20]Id. at ¶ 33,

[21]Record of Decision at 2.

not be offset by the protection of other lands to be received under an exchange.... [B]ecause reasonable and viable transportation alternatives exist to meet the important health and safety needs of the people of King Cove, the final decision of the Department is to adopt the no action alternative as described in the EIS.[22]

The Secretary determined that "[t]he OPLMA does not require a public interest determination for the selection of alternatives that do not include the land exchange"[23] and thus the ROD did not contain a public interest determination.

On June 4, 2014, plaintiffs commenced this APA action in which they challenge the Secretary's adoption of the "no action" alternative. Plaintiffs assert five claims for relief in their complaint. In their first claim for relief, plaintiffs allege that the Secretary violated the OPLMA in a variety of ways. In their second claim for relief, plaintiffs assert an APA claim in which they allege that the Secretary's decision was arbitrary and capricious. In their third claim for relief, plaintiffs assert a NEPA claim. In their fourth claim for relief, plaintiffs assert an ANILCA claim. And, in their fifth claim for relief, plaintiffs allege that defendants have violated the trust responsibility the federal government has to American and Alaska Native citizens.

---

[22]Id. at 3.

[23]Id. at 6.

On July 21, 2014, the State of Alaska's motion to intervene as a plaintiff in this matter was granted,[24] and on July 29, 2014, the State filed its complaint in intervention.[25] The States asserts the same five claims for relief as plaintiffs have asserted.

Defendants[26] now move to dismiss a portion of plaintiffs' OPLMA claim and plaintiffs' second, third, fourth, and fifth claims in their entirety. Defendants also move to dismiss the State's complaint in intervention in its entirety.

<u>Discussion</u>

Defendants' motions to dismiss are brought pursuant to Rules 12(b)(1) and (b)(6), Federal Rules of Civil Procedure. "Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways." <u>Leite v. Crane Co.</u>, 749 F.3d 1117, 1121 (9th Cir. 2014). "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" <u>Id.</u> (quoting <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004)). "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the

---

[24]Docket No. 11.

[25]Docket No. 40.

[26]For purposes of this order "defendants" refers to both the named defendants and the intervenor-defendants.

court's jurisdiction." Id. "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." Id. "When the defendant raises a factual attack, the plaintiff must support [its] jurisdictional allegations with competent proof under the same evidentiary standard that governs in the summary judgment context." Id. (internal citation omitted).

"Rule 12(b)(6) authorizes courts to dismiss a complaint for 'failure to state a claim upon which relief can be granted.'" In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Fed. R. Civ. P. 12(b)(6)). "To avoid dismissal, the complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "'[A] plaintiff must 'allege sufficient factual matter ... to state a claim to relief that is plausible on its face.'" OSU Student Alliance v. Ray, 699 F.3d 1053, 1061 (9th Cir. 2012) (quoting Pinnacle Armor, Inc. v. United States, 648 F.3d 708, 721 (9th Cir. 2011)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-43 (9th Cir. 2012).

Plaintiffs' First Claim for Relief —- OPLMA Claim

Defendants move to dismiss the portion of plaintiffs' OPLMA claim asserted in paragraph 52 of their complaint. In paragraph 52, plaintiffs allege that

[t]he Secretary violated OPLMA by failing to make a public interest finding regarding whether or not the "no action" alternative was in the best interest of the United States, including the federal government's Trust responsibility to Alaska Natives.[27]

Defendants argue that this is not a plausible claim because the OPLMA did not require that the Secretary make a public interest determination if she selected the "no action" alternative. As set out above, the Secretary interpreted the OPLMA as "not requir[ing] a public interest determination for the selection of alternatives that do not include the land exchange."[28]

"In reviewing an agency's construction of a statute that it is charged with administering," the court "ask[s], first, 'whether Congress has directly spoken to the precise question at issue.'" Palomar Medical Ctr. v. Sebelius, 693 F.3d 1151, 1164 (9th Cir. 2012) (quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984)). "'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" Id. (quoting Chevron, 467 U.S. at 842–43). "But 'if the statute is silent or ambiguous with respect to the specific issue,' [the court] 'does not simply impose its own construction on the statute,' but rather, ask[s], second, 'whether the agency's answer is based on a

---

[27]Complaint [etc.] at 22, ¶ 52, Docket No. 1.

[28]Record of Decision at 6.

permissible construction of the statute.'" Id. (quoting Chevron, 467 U.S. at 843). "If the agency's construction is reasonable," the court "defer[s] to it." Id.

Subsection 6402(d)(1) of the OPLMA provided, in pertinent part, that "to carry out the land exchange under subsection (a), the Secretary shall determine that the land exchange (including the construction of the road between the City of King Cove, Alaska and the Cold Bay Airport) is in the public interest." In this provision, Congress directly and expressly addressed the specific question of when a public interest determination is required. The statute unambiguously provides that the public interest determination is a condition of carrying out the land exchange. If there is going to be a land exchange, the Secretary must make a public interest determination. But, if there is not going to be a land exchange, the statute does not require the Secretary to make such a determination. Because Congress' intent was clear, "'that is the end of the matter[,]'" Palomar Medical Ctr., 693 F.3d at 1164 (quoting Chevron, 467 U.S. at 842–43), and the court need not proceed to step two of the Chevron analysis.

Because the statutory language is clear and unambiguous, and because the Secretary's application of Section 6402(d) comports with the plain meaning of the statute, it follows that the Secretary has not violated the OPLMA as contended by plaintiffs in paragraph 52 of their complaint. Defendants' motion to dismiss the portion of plaintiffs' OPLMA claim that is based on paragraph 52 is granted.

<u>Plaintiffs' Second Claim for Relief – APA Claim</u>

Defendants argue that plaintiffs' second claim for relief, which is a "stand-alone" APA claim, should be dismissed because such a claim is not justiciable and because this claim is duplicative. The court agrees with defendants. The actions by the Secretary that plaintiffs are alleging were arbitrary and capricious are duplicative of plaintiffs' OPLMA and NEPA claims. <u>See</u> <u>M.M. v. Lafayette School Dist.</u>, 681 F.3d 1082, 1091 (9th Cir. 2012) ("[i]t is well established that a district court has broad discretion to control its own docket, and that includes the power to dismiss duplicative claims"). In addition, "the APA relates to the court's authority and standard of review of agency actions, and does not give rise to a cause of action absent some other statutory or regulatory duty[.]" <u>Oregon Natural Resources Council Action v. U.S. Forest Service</u>, 445 F. Supp. 2d 1211, 1223 n.3 (D. Or. 2006) (citing <u>Or. Natural Res. Council v. Thomas</u>, 92 F.3d 792, 798-99 (9th Cir. 1996)); <u>see also</u>, <u>El Rescate Legal Services, Inc. v. Executive Office of Immigration Review</u>, 959 F.2d 742, 753 (9th Cir. 1991) (citation omitted) ("There is no right to sue for a violation of the APA in the absence of a relevant statute whose violation forms the legal basis for [the] complaint"). Thus, defendants' motion to dismiss plaintiffs' second claim for relief is granted.

<u>Third Claim for Relief – NEPA Claim</u>

Defendants argue that plaintiffs' NEPA claim should be dismissed because plaintiffs' alleged injury does not fall within NEPA's zone of interests. "Because NEPA does not

provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act ('APA')[.]" Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 939 (9th Cir. 2005) (internal citations omitted). "Under the APA, 'a person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.'" Id. (quoting 5 U.S.C. § 702). "The Supreme Court has interpreted this section of the APA as imposing a prudential standing requirement[29] that 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute ... in question.'" Id. at 939-40 (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)). "[T]he zone of interests that NEPA protects [is] environmental." Id. at 940.

Defendants argue that the interests that plaintiffs are claiming are not environmental and thus are not within NEPA's zone of interests. Defendants contend, and plaintiffs do

---

[29]Recently, "the Supreme Court indicated that the question of whether a particular plaintiff has a right to sue under a given substantive statute, though often previously discussed as 'prudential standing,' is more appropriately dealt with not in terms of standing but instead as a matter of statutory interpretation, determining 'whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.'" El Dorado Estates v. City of Fillmore, 765 F.3d 1118, 1122 (9th Cir. 2014) (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1387 (2014)). The Ninth Circuit, however, continues to use the term "prudential standing." See, e.g., Alliance for the Wild Rockies v. U.S. Dep't of Agric., 772 F.3d 592, 600 (9th Cir. 2014) (citation omitted) ("prudential standing under NEPA also requires a showing that the alleged injury falls within the 'zone of interests' that NEPA was designed to protect").

not dispute, that the primary interests that plaintiffs are claiming have been injured involve health and safety concerns, not environmental concerns. Plaintiffs allege that "[t]he no action alternative selected by the Secretary violates NEPA because, by failing to provide safe, reliable and affordable transportation from King Cove to the Cold Bay Airport, it does not meet the Project's Purpose and Need[.][30] Plaintiffs allege that the lack of safe and reliable transportation between King Cove and the Cold Bay Airport has put the health and safety of King Cove residents who need to be medivaced at risk.[31]

Risks to human health and safety do not fall within NEPA's zone of interests if they have no connection to the physical environment. See Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Agric., 415 F.3d 1078, 1103-04 (9th Cir. 2005) (emphasis added) (holding that the plaintiff's NEPA claim failed because its "claimed interest ... ha[d] no connection to the physical environment; rather, it is solely a matter of human health"). But, here the health and safety concerns that plaintiffs have alleged have a connection to the physical environment. Plaintiffs allege that the Secretary reached her decision to adopt the "no action" alternative by overstating the adverse impacts that the action alternatives would have on the physical environment.[32] Because

---

[30]Complaint [etc.] at 33, ¶ 77, Docket No. 1.

[31]Id. at 8-9, ¶¶ 22-25.

[32]Id. at 38, ¶ 84 & 39, ¶¶ 86-87. A NEPA claim can be based on allegations that the
(continued...)

plaintiffs' claimed interests have a connection to the physical environment, plaintiffs'

NEPA claim is plausible.

<u>Plaintiffs' Fourth Claim for Relief – ANILCA Claim</u>

Defendants move to dismiss plaintiffs' ANILCA claim on the grounds that plaintiffs

lack standing to bring such a claim and that plaintiffs have failed to state a plausible

ANILCA claim. Title VIII of ANILCA, 16 U.S.C. §§ 3111-3126, establishes a priority for

subsistence hunting and fishing by residents of rural Alaska. Title VIII has application to

"all public land" including the Izembek National Wildlife Refuge. 16 U.S.C. § 3102(1)-(3).

Section 810(a) of ANILCA provides, in pertinent part, that

> [i]n determining whether to withdraw, reserve, lease, or
> otherwise permit the use, occupancy, or disposition of public
> lands under any provision of law authorizing such actions, the
> head of the Federal agency having primary jurisdiction over
> such lands or his designee shall evaluate the effect of such use,
> occupancy, or disposition on subsistence uses and needs[.]

16 U.S.C. § 3120(a). The Secretary addressed ANILCA concerns in an appendix D to the

EIS. Plaintiffs allege that the Secretary violated ANILCA by concluding that "there would

be no significant restriction to subsistence uses under any of the alternatives, including the

---

[32](...continued)
EIS overstates risks and/or benefits. <u>See</u> <u>League of Wilderness Defenders-Blue Mountains</u>
<u>Biodiversity Project v. U.S. Forest Srvc.</u>, 689 F.3d 1060, 1068 (9th Cir. 2012) (the plaintiffs'
NEPA claim was based, in part, on allegations that the EIS "overstates the risk of wildfire
and beetle infestation").

selected no action alternative...."[33]  Plaintiffs allege eight specific ways in which they contend that the Secretary failed to consider the "effects on the access to and use of subsistence resources in the Project Area...."[34]

Defendants first argue that plaintiffs lack standing to assert an ANILCA claim. "Standing to bring suit in federal court under Article III is an 'irreducible constitutional minimum' consisting of three elements: injury in fact, causation, and redressability." El Dorado Estates, 765 F.3d at 1121 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  Defendants argue that plaintiffs have not alleged an injury in fact because they have not alleged that they engage in subsistence uses.  In response, the two individual plaintiffs have submitted declarations in which they aver that they use lands within the Izembek Wildlife Refuge for subsistence purposes and that the proposed land exchange would enhance their ability to use the Refuge for subsistence purposes.[35]  The court assumes for purposes of discussion that these declarations sufficiently demonstrate that these two individuals have standing to assert an ANILCA claim.[36]

---

[33]Record of Decision at 19-20.

[34]Complaint [etc.] at 44-45, ¶ 100, Docket No. 1.

[35]Declaration of Etta Kuzakin at 1, ¶ 3 & 2, ¶ 10, Docket No. 55; Declaration of Leff Kenezuroff at 1, ¶ 3 & 2-3, ¶ 9, Docket No. 56.

[36]The court "need not address the standing of each plaintiff if [it] conclude[s] that any plaintiff has standing."  Calif. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S.
(continued...)

However, plaintiffs' ANILCA claim must still be dismissed because it is not plausible. The Secretary adopted the "no action" alternative and thus there has been no disposition of public lands. In <u>City of Angoon v. Hodel</u>, 803 F.2d 1016, 1028 (9th Cir. 1986), the court held that a Section 810 ANILCA claim failed, in part, because the agency that had jurisdiction over the lands in question had taken no action, such as leasing, reserving, or otherwise disposing of the land in question. Here too, the Secretary has taken no action that would invoke Section 810. Because the Secretary has taken no action that would result in the disposition of public lands, plaintiffs' ANILCA claim is not plausible. Defendants' motion to dismiss plaintiffs' fourth claim for relief is granted.

<u>Fifth Claim for Relief – Trust Responsibility</u>

Plaintiffs' fifth claim for relief is based on their contention that the Secretary's "no action" decision violates a trust duty which the United States owes to Alaska Natives. Defendants argue that this claim should be dismissed because plaintiffs have not identified an enforceable trust duty. "In general, a trust relationship exists between the United States and Indian Nations." <u>Marceau v. Blackfeet Housing Auth.</u>, 540 F.3d 916, 921 (9th Cir. 2008). "But that relationship does not always translate into a cause of action." <u>Id.</u> "'[U]nless there is a specific duty that has been placed on the government with respect to Indians, [the government's general trust obligation] is discharged by [the government's] compliance

---

[36](...continued)
<u>Dep't of the Interior</u>, 767 F.3d 781, 789 (9th Cir. 2014).

with general regulations and statutes not specifically aimed at protecting Indian tribes.'"

Gros Ventre Tribe v. United States, 469 F.3d 801, 810 (9th Cir. 2006) (quoting Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 574 (9th Cir. 1998)). "Tribes cannot allege a common law cause of action for breach of trust that is wholly separate from any statutorily granted right." Id. "When a tribe sues the government for damages," or equitable relief, " it 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" Quechan Tribe of Fort Yuma Indian Reservation v. United States, Case No. CIV 10–02261–PHX–FJM, 2011 WL 1211574, at *2 (D. Ariz. March 31, 2011) (quoting United States v. Navajo Nation, 537 U.S. 488, 506 (2003)).

In their complaint, plaintiffs identify two Executive Orders, the Indian Health Care Improvement Act of 1976 (IHCIA), and the OPLMA as the sources of the asserted trust obligation. Plaintiffs' reliance on the Executive Orders is misplaced as both orders expressly disclaim the creation of any enforceable rights or benefits.[37] Plaintiffs' reliance on the IHCIA is also misplaced. The IHCIA was primarily an appropriations statute and

---

[37] Exec. Order No. 13647, Sec. 5(f), 78 Fed. Reg. 39539, 39542 (June 26, 2013) ("This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person"); Exec. Order No. 13592, Sec. 5(f), 76 Fed. Reg. 76603, 76607 (Dec. 2, 2011) ("This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person").

it does "not impose a duty on defendants to provide a certain level of health care, preserve and maintain tribal property, or be a health care provider." Quechan Tribes, 2011 WL 1211574, at *3. Rather, the IHCIA "speak[s] of Indian health only in general terms." Tsosie ex rel. Estate of Tsosie v. United States, 441 F. Supp. 2d 1100, 1105 (D.N.M. 2004). Plaintiffs have not identified any term of the IHCIA which specifically and expressly creates a duty to promote Indian health by dedication of public lands for a road which would facilitate access to health care facilities.

Plaintiffs also allege that the OPLMA imposes a specific trust duty. But, there is no language in the OPLMA that suggests that Section 6402 establishes or was intended to establish any trust obligation between the Secretary and plaintiffs for purposes of a possible land exchange. The word "trust" does not appear in the statute and the "public interest" determination that the Secretary was required to do if she were going to approve the land exchange encompasses the interests of all members of the public, not just the special needs of Alaska Natives. The inclusion of a broad "public interest" determination tends to negate plaintiffs' assertions of a special trust responsibility in the OPLMA as does the inclusion of non-tribal entities as cooperating agencies.

In their response to defendants' motion to dismiss, plaintiffs argue that the enforceable trust duty was imposed by a March 21, 2013 letter from former Secretary Salazar to defendant Washburn. As set out above, in directing Washburn to visit King

Cove, Salazar invoked the unique trust relationship that the government has with Alaska Natives. But this invocation did not create an enforceable trust duty because executive branch officials cannot define the parameters of the United States' trust relationship. See United States v. Jicarilla Apache Nation, 131 S. Ct. 2313, 2325 (2011) ("The Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute").

Because plaintiffs have not identified a substantive source of law that imposed a trust duty upon the Secretary in connection with the proposed land exchange, plaintiffs' breach of trust claim is not plausible. Defendants' motion to dismiss plaintiffs' fifth claim for relief is granted.

State of Alaska's Claims

Defendants argue that the State's claims must be dismissed because the State lacks Article III standing. But, "[o]nly one of the Plaintiffs must have standing to permit" review of agency action. Natural Resources Defense Council v. U.S. E.P.A., 542 F.3d 1235, 1248 (9th Cir. 2008). Because plaintiffs have standing to assert their claims, the court need not consider whether the State also has standing. As defendants point out, the court could, in its discretion, analyze whether the State has standing. See Thiebaut v. Colorado Springs Utilities, Case No. 10–1471, 2011 WL 4824326, at *6 (10th Cir. Oct. 12, 2011) ("courts retain discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs

that lack standing"). The court, however, declines to exercise its discretion to analyze whether the State has Article III standing given that the State's claims are parallel to plaintiffs' claims.

But because the State's claims are parallel to plaintiffs' claims, some of the State's claims must be dismissed for the same reasons that some of plaintiffs' claims are being dismissed. Thus, the portion of the State's OPLMA claim (paragraph 28) that is based on Secretary's failure to make a public interest determination is dismissed; the State's ANILCA claim is dismissed; the State's breach of trust claim is dismissed; and the State's "stand-alone" APA claim is dismissed.

Conclusion

Defendants' motion to dismiss[38] some of plaintiffs' claims is granted in part and denied in part. The portion of plaintiffs' first claim for relief (the OPLMA claim) that is based on allegations that the Secretary failed to make a public interest determination is dismissed. Plaintiffs' second claim for relief (the stand-alone APA claim) is dismissed. Plaintiffs' fourth claim for relief (the ANILCA claim) is dismissed. Plaintiffs' fifth claim for relief (the trust claim) is dismissed. The motion is otherwise denied. Plaintiffs are not given leave to amend as to any of the dismissed claims as amendment would be futile.

---

[38]Docket No. 44.

Defendants' motion to dismiss[39] the State of Alaska's claims is granted in part and denied in part. The portion of State's first claim for relief (the OPLMA claim) that is based on allegations that the Secretary failed to make a public interest determination is dismissed. The State's third claim for relief (the ANILCA claim) is dismissed. The State's fourth claim for relief (the trust claim) is dismissed. The State's fifth claim (the stand-alone APA claim) is dismissed. The motion is otherwise denied. The State is not given leave to amend as to any of the dismissed claims as amendment would be futile.

DATED at Anchorage, Alaska, this 19th day of December, 2014.

/s/ H. Russel Holland
United States District Judge

---

[39]Docket No. 45.