KAREN L. LOEFFLER
United States Attorney

RICHARD L. POMEROY
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
Telephone: (907) 271-5071
Facsimile: (907) 271-2344
Richard.Pomeroy@usdoj.gov

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

STACEY BOSSHARDT, Senior Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-2912
(202) 305-0506 (fax)
stacey.bosshardt@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| AGDAAGUX TRIBE OF KING COVE, et al., Plaintiffs,<br><br>and<br><br>STATE OF ALASKA, Intervenor-Plaintiff,<br><br>v.<br><br>SALLY JEWELL, Secretary of the Department of Interior, et al., Defendants,<br><br>and<br><br>FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al., Intervenor-Defendants. | 3:14-cv-00110 (HRH)<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

I. FWS's Discussion, Description, and Consideration of Alternatives
Satisfy NEPA ...........................................................................................................2

II. FWS's Selection of Alternative 1 Complied with NEPA and the
Omnibus Public Land Management Act of 2009 ..................................................6

III. FWS's Discussion of the Exchange Lands Satisfies NEPA
and OPLMA ............................................................................................................7

IV. FWS's Discussion of Health and Safety Related Impacts Satisfies NEPA .....11

CONCLUSION ................................................................................................................13

**INTRODUCTION**

As Defendants showed in their opening brief, the Fish and Wildlife Service and the Secretary of the Interior complied fully with the National Environmental Policy Act when analyzing and making a decision regarding the proposed land exchange and road through the Izembek Wildlife Refuge. The analysis supports the Secretary's conclusions that the likely impacts to the Refuge from the road's construction and use would "irreversibly and irretrievably" affect the unique resources, including migratory birds, bears, and caribou, that use habitat within and around the Refuge, and that viable transportation alternatives to a road exist. Plaintiffs continue to argue with the Secretary's conclusions, which ascribed greater weight to adverse impacts of an exchange within the Refuge, and less weight to the alleged transportation advantages of a road and other benefits from adding exchange lands to the federal inventory, than they would have preferred. But NEPA does not allow the Court to second-guess the Secretary's evaluation of information in the Environmental Impact Statement and other record documents, or the manner in which she chose to balance considerations of law and policy that fall within the agency's mission. The Secretary's determinations are supported by the record and owed deference under the Administrative Procedure Act. The EIS provided a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the alternatives, including the alternative ultimately selected, and NEPA requires nothing more. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

**I.     FWS's Discussion, Description, and Consideration of Alternatives Satisfy NEPA.**

Although NEPA requires an agency to consider reasonable alternatives to a proposed action, it does not specifically prescribe the content for an agency's discussion of alternatives. The five alternatives studied in the EIS "achieved the goals intended by NEPA: open, thorough public discussion promoting informed decision-making." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004). Because the EIS studied a reasonable range of alternatives, including a no-action alternatives, two road-build alternatives, and two marine-land link alternatives, the EIS satisfies NEPA. As for the two non-road transportation alternatives included in the ROD's references to viable transportation alternatives -- Alternatives 4 (hovercraft between Northeast Terminal and Cross Wind Cove)[1] and 5 (Lenard Harbor Ferry) -- Plaintiffs do not dispute that those alternatives were fully vetted, analyzed, and considered in the NEPA documents, or that they (along with the two road alternatives and no-action alternative) constituted a reasonable spectrum of action alternatives.

The EIS's discussion of the no-action alternative also satisfies NEPA. As FWS explained in the challenged ROD and in its opening brief, its consideration of the No-Action alternative, including the possibility that AEB would develop a landing craft, was proper under NEPA's mandate that agencies use the no-action alternative to predict impacts from the status quo. 40 C.F.R. § 1502.14(d) (requiring agency to consider "no action" alternative); AR220118 (ROD) (no-action "serves as a baseline of existing impacts continued into the future against which to compare impacts of action alternatives."); *see also* Defs.' Mem., 16-18 (citing authorities), ECF

---

[1] Despite FWS's correction, *see* Defs.' Mem. 19, n.12, Plaintiffs continue to misstate the distance of the hovercraft alternative as "14 miles," using the interim Lenard Harbor departure point as the eastern terminus, rather than its actual distance of eight miles. AR220110 ("The link to the Cold Bay Airport would involve a shorter eight mile passage across Cold Bay than what was utilized by a hovercraft during its three years of operation").

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, DEFS.' REPLY MEM. IN
SUPPORT OF CROSS MOT. FOR SUMM. J.                                                                                              2
`
Case 3:14-cv-00110-HRH   Document 88   Filed 04/22/15   Page 4 of 16

No. 83, AEB had described such a craft in a letter to the Corps of Engineers about its plans for the road to the hovercraft landing site following its decision to discontinue the hovercraft, stating that the possibility of a landing craft between the northeast terminal and Cross Wind Cove "held promise"; might be "more technically and financially viable than a hovercraft"; and could be adapted "to use the landing pad at the Northeast terminal which is to be constructed in accordance with the existing plans, specs and permits." AR184026.[2] Later, AEB declined to provide additional information about the landing craft option. *See, e.g.,* AR184034 (July 9, 2012 letter from Stanley Mack responding to five specific questions about landing craft plans); AR120635 (May 18, 2012 KCG comments) (AEB "has outlined a conceptual plan for an aluminum landing craft that might be modified to allow the vessel to use the landing pads at the northeast corner and at Cross Wind Cove. It must be noted that this conceptual plan IS only a concept. There is no vessel and the concept will only be explored further if and only if the Secretary does not find the land exchange is in the public interest."); AR120642 ("Funding, estimated annual operating costs and annual ridership of the conceptual landing barge travelling between the northeast corner of Cold Bay and Cross Wind Cove are speculative."). The FEIS and ROD acknowledge that in the event of no land exchange, development and use of a landing craft might not occur, and that even if it does, levels of service are unknown. AR181132, AR181050. Because the missing information was neither "'relevant to reasonably foreseeable significant adverse impacts" nor "essential to a reasoned choice among alternatives," *see* 40 C.F.R. § 1502.22(a), the analysis in the EIS was reasonable. The EIS accurately and reasonably depicts the likely effects of no-action, as the FWS understood them, and its analysis of this alternative satisfies NEPA.

---

[2] These assumptions are incorporated into the ROD. AR220119.

Plaintiffs' continued insistence that the Secretary made a "determination" that the landing craft alternative was "viable" is not supported by the administrative record.[3] The ROD describes the Alternative as "viable" in the context of discussing multiple transportation alternatives that could ("depending on levels of service," AR181050) achieve Plaintiffs' objective of providing more reliable transportation between King Cove and Cold Bay, including two that were analyzed as stand-alone alternatives in the EIS. But with respect to the landing craft – discussed not as a stand-alone alternative but as one possible scenario under the no-action alternative – the ROD and FEIS describe in multiple places the limitations on the agency's ability to analyze that alternative. *See, e.g.*, AR14307, AR178062, AR181105-06, AR220119.[4] The FWS noted that AEB had "identified the general dimensions, passenger capacity, and type of craft" under exploration but not "the frequency of operations it would offer, the specifics on the design of a vessel, or the timeline for when a landing craft could become operational in the future." AR181105. FWS acknowledged that "[w]ithout those specifics, the Service does not have complete data regarding the reasonably predictable actions of the Aleutians East Borough to

---

[3] From this inaccurate premise, Plaintiffs argue that "the existence of a viable but unexamined alternative renders an [EIS] inadequate." Pls.' Reply 1, 5, ECF No. 86. This argument is at odds with Plaintiffs' assertion in this litigation – and (at times) during the NEPA process – that the landing craft alternative is *not* viable. *See, e.g.*, *id.* 9 (arguing that because assumptions were not verified, landing craft was not a reasonable alternative). Moreover, in this case the FWS did not need to add a sixth alternative (a third involving a marine-road link) to the EIS because the range of alternatives considered was reasonable. Two marine-road link alternatives were studied in depth. An agency is not required to undertake a "separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Westlands*, 376 F.3d at 868; *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir.1990) (internal citations omitted).

[4] Notwithstanding the FWS's limited information, its EIS did discuss impacts of the landing craft that might differ from those studied in other alternatives, e.g., impacts to fish, AR182108-10, marine mammals, AR182115-17, or from hazardous materials, AR182100 (explaining requirement of hazardous materials and petroleum product control if landing craft/passenger ferry developed).

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, DEFS.' REPLY MEM. IN
SUPPORT OF CROSS MOT. FOR SUMM. J. 4
`
Case 3:14-cv-00110-HRH   Document 88   Filed 04/22/15   Page 6 of 16

develop this mode of transportation if the land exchange does not occur." *Id.* In order to depict the no-action alternative as accurately as possible under the circumstances, the agency used "the general specifications for the craft provided by the borough . . . supplemented with general information provided by manufacturers of a vessel similar to that generally described by [AEB]"[5] but explained that because "no information is available concerning operation plans for the landing craft/passenger ferry should it be acquired, no estimates have been made as to annual revenue or costs of operation since they would be too speculative." *Id.* The limitations on this analysis could not have been avoided by analyzing the landing craft as a separate alternative in a supplemental EIS even if NEPA required consideration of a third marine-land link alternative (it did not, *see* Defs.' Mem. 22-25) because their root cause was the sponsor's refusal to provide full information about its intentions.[6]

Remarkably, despite AEB's refusal to provide information about the landing craft during the development of the FEIS, Plaintiffs now argue that FWS did not adequately respond to comments they submitted criticizing the landing craft alternative. Plaintiffs asserted in some of their comments that the alternative was not viable due to FWS's failure to analyze the alternative's performance under the climate/wave conditions in Cold Bay or based on economic criteria. FWS did respond to those comments, citing its inability to perform this analysis given

---

[5] Plaintiffs complain that the manufacturer's name was not disclosed, Pls.' Reply 10, but as they know, this information was provided to the cooperating agencies. AR 137831, AR137833 (discussing call to Specmar). It was not included in the FEIS because of a decision to keep the analysis at a higher level of generality given objections from Plaintiffs.

[6] Plaintiffs point to their statement that the landing craft would have had to provide transportation "24-7" to satisfy emergency medical evacuation needs. AR199563. This response was argumentative, not informative, and did not enable FWS to analyze a no-action alternative based on information about what level of service AEB might realistically provide. *See* Forty Most Asked Questions, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (no action alternative should analyze "*predictable* actions by others") (emphasis added).

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, DEFS.' REPLY MEM. IN
SUPPORT OF CROSS MOT. FOR SUMM. J.                                                                              5
`

its lack of information (AR183111), which persisted until the time the EIS was completed and the ROD signed. That Plaintiffs do not like this response is not a violation of NEPA. *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013) ("[A] lead agency does not violate NEPA when it does not defer to the concerns of other agencies."); *Hells Canyon Pres. Council v. Jacoby*, 9 F.Supp.2d 1216, 1242 (D.Or.1998) ("An agency is required to consider the comments of other agencies, but it does not have to defer to them when a disagreement exists.") (citations omitted).[7]

## II. FWS's Selection of Alternative 1 Complied with NEPA and the Omnibus Public Land Management Act of 2009.

Plaintiffs' argument that the no-action alternative failed to achieve the project's purpose and need does not establish any violation of law because NEPA prescribes a process, not the results of that process. *Robertston v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Hale v. Norton*, 476 F.3d 694, 700 (9th Cir. 2007); *Pacific Coast Fed'n v. Blank*, 693 F.3d 1084, 1088 (9th Cir. 2012) ("NEPA's mandate is purely procedural."). As shown in Defendants' opening brief, OPLMA does not impose any additional requirement that the decision must further the health, safety, "affordable transportation", and "quality of life" objectives discussed in the EIS – as the EIS explains, this far-ranging discussion is "broader than the focused purpose" specified in OPLMA itself. AR180990.

Plaintiffs also contend that FWS's argument that the no-action alternative need not satisfy the purpose and need in the EIS is a "post hoc rationalization." Not so. AR181049 (EIS Chapter 2) (acknowledging that no-action alternative "is analyzed as a baseline for comparative purposes

---

[7] *See also Block*, 690 F.2d at 773 (internal citations omitted) (NEPA does not require agencies to "set forth at full length the views with which it disagrees"; "conduct new studies in response to issues raised in the comments"; or "resolve conflicts raised by opposing viewpoints.").

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, DEFS.' REPLY MEM. IN
SUPPORT OF CROSS MOT. FOR SUMM. J.     6
`
Case 3:14-cv-00110-HRH   Document 88   Filed 04/22/15   Page 8 of 16

with the action alternatives" but might "not meet the purpose and need identified for the project"); AR183121 (response to comments) (no-action alternative need not satisfy purpose and need). Regardless, the requirements for the no-action alternative under NEPA were satisfied. Plaintiffs mischaracterize the decision in *Friends of Southeast v. Morrison*, 153 F.3d 1059 (9th Cir. 1998), claiming that "the court held that the Forest Service did not have to consider the 'no action' alternative because it failed to meet the purpose and need of the EIS." Pls.' Reply 14. Instead, the court expressly recognized that "[i]nformed and meaningful consideration of alternatives - including the no action alternative - is ... an integral part of [NEPA's] statutory scheme," and upheld instead the agency's decision not to *select* the no-action alternative in its record of decision. 153 F.3d at 1065; *see also* Forty Most Asked Questions, 46 Fed. Reg. at 18,027 ("[I]t is difficult to think of a situation where it would not be appropriate to address a 'no action' alternative."). Here, the Secretary's decision (to select the no-action alternative) is supported by the analysis in the EIS and ROD. It was not "arbitrary and capricious," and complies fully with NEPA, OPLMA, and other applicable law.

### III.  FWS's Discussion of the Exchange Lands Satisfies NEPA and OPLMA.

Plaintiffs fare no better with their argument that FWS did not take a sufficiently hard look at potential impacts to the exchange lands. The EIS discusses how those lands, including their ownership and management, would be affected under each of the alternatives considered. This discussion includes acknowledgement in appropriate cases that impacts could occur under a no-action scenario. But the EIS nonetheless supports the Secretary's conclusion in the ROD that the exchange lands "were not likely to be developed, if retained in their current ownership, *in ways that would affect the same resources*" as a road that would bisect the fragile ecosystem of the isthmus. This conclusion was not arbitrary and capricious.

For the reasons explained in FWS's opening brief, the decision to reject the proposed land *exchange* is wholly consistent with the policies in the 1988 Land Protection Plan ("Plan") for prioritizing the *purchase* of inholdings from voluntary sellers.[8] The Plan identified certain inholdings (including two parcels analyzed as exchange parcels in the land exchange EIS) as priorities for purchase, but explained that developmental pressures were low and that in some cases, "wildlife resources may be adequately protected under private ownership and no Federal action would be recommended."[9] AR235491. In contrast, the Plan notes that the "greatest known potential threat to wildlife and wilderness values" at Izembek is the "proposal to construct a road across refuge and King Cove Corporation lands." AR235488. The Secretary's decision in this case, which protects 300,000 acres of wilderness in a wildlife refuge from the "greatest . . . threat to wildlife and wilderness values," is consistent with the values and priorities described in the Plan.

Finally, even if Plaintiffs were correct that the decision somehow deviated from a policy set forth in the Plan, what is required under the precedents Plaintiffs cite[10] ("a reasoned

---

[8] Plaintiffs incorrectly assert that "there is no mention in the FEIS or ROD of the [Land Protection Plan]," Pls.' Reply. 17, but the EIS specifically cites it. *See* AR181005-06.

[9] Plaintiffs' argument the Plan established an "urgency" to acquire the tracts it identifies, but this argument relies on a single word isolated from its context. As part of the guidelines for "protection proposals", the Plan states that one factor to be considered is the threat of development; it explains that "[d]evelopment or human use of private land that could impact refuge wildlife adds urgency to the need for protection." AR235492. Notably, at the time the Plan was written, the FWS found "no known, major, imminent threats to refuge resources that could be eliminated by methods described in this plan." AR235489. Another criterion the Plan identifies -- that protection measures should "simplify, not complicate, Refuge management" – clearly would not be met by the proposed land exchange. *Cf.* AR182126 ("Izembek National Wildlife Refuge does not have the capability or staff to maintain roads during the winter and summer seasons").

[10] The case Plaintiffs cite, *FCC v. Fox Television Stations*, 556 U.S. 502 (2009), upheld a change in the FCC's interpretation and enforcement of its indecency policy against regulated entities.

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, DEFS.' REPLY MEM. IN
SUPPORT OF CROSS MOT. FOR SUMM. J. 8
`

explanation for the adoption of the new policy,") is in the ROD, which provides a lengthy discussion of the Secretary's reasons for declining the exchange. AR220107-26.

Plaintiffs assert that the analysis of impacts to the 5,430-acre King Cove selection parcel, AR182106, is arbitrary and capricious because it understates the level of development that may still occur consistent with ANSCA Section 22(g). Plaintiffs list a number of uses of the area that have already been found to be "compatible" by FWS, including construction of a single-lane gravel road and other activities related to the development of the Northeast terminal. Obviously, uses that are "compatible" with Refuge purposes need not best achieve those purposes, and FWS recognizes its responsibility to allow productive uses of land by other entities that own those lands so long as those uses do not unduly harm the values of adjacent refuge lands. Although the FWS found that no future plans for development of this parcel had been identified, AR181208, the EIS properly discusses that additional development of this area is possible and addresses the attendant risks (e.g., increased ATV usage) in multiple places. AR181208-09, AR181147 AR181172. This discussion provides the "hard look" NEPA requires.

The other faults Plaintiffs assert regarding the analysis of exchange lands impacts amount to impermissible "flyspecking," *Oregon v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987), or disagreement with the relative weight FWS ultimately accorded to these impacts compared to impacts from the road-build alternatives. For instance:

- Plaintiffs incorrectly claim that the analysis did not properly consider impacts of the no-action alternative to wetlands that would not be added to federal ownership. But the EIS states that under Alternative 2 "the federal government would gain approximately 12726 acres of wetlands while relinquishing ownership of 993 acres

---

Obviously, the Plan does not engender the kinds of reliance interests at play when the FCC enforces civil penalties against licensees. It is not clear that the legal standards announced in that decision would apply to an alleged change in an agency's aspirations for obtaining land through voluntary transactions, subject to the availability of funding.

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, DEFS.' REPLY MEM. IN
SUPPORT OF CROSS MOT. FOR SUMM. J.                                                                           9
`

of wetlands (980 acres on Sitkinak Island and 13 acres in the road corridor)." AR181241; *see also* AR181240 (listing exchange lands wetlands). Chapter 3 of the EIS analyzes the wetlands values of each of the exchange tracts in detail. AR181706-08. These values are then compared to the values of wetlands that would be affected by the proposed road. *See, e.g.,* AR181707 (noting value of 980 acres of Sitkiak wetlands because of their "relation to Essential Fish Habitat and other waterfowl habitats," but that value is "somewhat less than wetlands that are in closer proximity to Izembek and Kinzarof lagoons which are used more extensively by migratory birds and designated as Internationally Important Wetlands"). The wetlands values of the exchange lands are fully analyzed. Moreover, the EIS's responses to comments note that wetlands on the exchange lands will continue to be protected under the Clean Water Act, and thus provide their beneficial effects to wildlife, even if they remain in non-federal ownership. AR182971-73.

- Plaintiffs claim that the analysis did not properly consider impacts of the no-action alternative to submerged lands in the Kinzarof Lagoon, which would remain under the current management regime and not be transferred to the Izembek State Game Refuge. The EIS discusses these impacts, and specifically describes applicable differences in the State's current management, its management plan for the Izembek State Game Refuge, and management in National Wildlife Refuges. *See, e.g.,* AR181169, AR181241, AR181319, AR182973.

- Plaintiffs claim that the analysis did not consider impacts of the no-action alternative to Sitkinak lands, which would remain under federal management. They are incorrect. The EIS discusses the consequences for these lands under a no-action and various action alternatives, and predicts that if no action is taken, the lands will eventually inure to the Alaska Maritime Wildlife Refuge after the Coast Guard relinquishes them. AR181168, AR181170, AR181317-18.

The EIS's discussion of these impacts, like the other environmental impacts canvassed in the document's more than 2500 pages, satisfies NEPA's requirement to take a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the alternatives, *Block*, 690 F.2d at 761, and Defendants are entitled to summary judgment.

## IV. FWS's Discussion of Health and Safety Related Impacts Satisfies NEPA.[11]

The EIS and ROD expansively defined and analyzed the transportation needs of King Cove residents, including their needs related to medical evacuations. This analysis goes well beyond NEPA's requirements, or any requirements in OPLMA.[12] Plaintiffs reprise their argument that the Secretary tasked the Assistant Secretary of Indian Affairs with preparing a report to "address whether and to what extent a road is necessary to meet the emergency medical requirements of King Cove Cove"; that the AS-IA's report did not adequately address that issue; and that the report thus somehow violates the APA or NEPA. This argument is not supported by the administrative record and fails as a matter of law.

First, the AS-IA's thorough report is not –and plaintiffs have not alleged that it is --"final agency action" that can be challenged in its own right under the APA. *See Bennett v. Spear*, 520

---

[11] Defendants rely on their earlier-filed pleadings for their argument that Plaintiffs lack prudential standing to assert NEPA claims based on health, safety, and other social issues. Plaintiffs argue that the Court's earlier ruling rejecting this argument is the "law of the case," and cite *Pacific Coast Fed'n of Fishermen's Associations v. U.S. Dep't of the Interior,* 996 F. Supp. 2d 887 (E.D. Cal. 2014)*,* in support of their argument. In that case, the court had dismissed NEPA claims based in part on the plaintiffs' concession in its briefs that the challenged actions did not alter the status quo. During summary judgment briefing, the plaintiffs raised new arguments that were inconsistent with their earlier concession, and the court found those arguments to be foreclosed by the law of the case doctrine. 996 F. Supp. 2d at 900-01. Here, Defendants have maintained throughout this litigation that Plaintiffs lack prudential standing to assert their NEPA claims, and the case does not apply. *See* Mem. in Support of Defs.' Mot. for Partial Dismissal, 28-31, ECF No. 46; Reply Mem. in Support of Defs.' Mot. for Partial Dismissal, 12-17, ECF No. 59; Defs.' Mem., 13-16, ECF No. 83.

[12] OPLMA specifically directed the Secretary to analyze three things: the land exchange, construction and operation of the road, and the specific corridor within which the road would be built. Pub. L. 111-11, Title VI, Subtitle E*,* § 6402(b)(2). Health and safety were not included. This omission also undermines Plaintiffs' argument that Congress established a health and safety purpose and need in OPLMA.

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, Defs.' Reply Mem. in
Support of Cross Mot. For Summ. J. 11
`

U.S. 154, 178 (1997). The report is relevant, and reviewable by this Court, only insofar as it aided the Secretary's decision-making process with respect to the proposed land exchange.[13]

Second, even considered as part of the NEPA process of which it was a component, there is nothing incomplete, incorrect, or inadequate about the report. The report was commissioned for the purpose of addressing a particular issue, which it addressed at length. Plaintiffs' citation to *Tongass Conservation Society v. Cole,* 1:09-cv-00003-JWS (D. Alaska), a case in which changes in the economic information contained in NEPA documents were found to require a supplemental EIS, is not on point, as Plaintiffs do not allege any factual inaccuracies in AS-IA's report – to the contrary, they cite the information in the report to support their own arguments. *See, e.g.,* Pls.' Reply 4 n.6; Pls.' Jt. Mem. in Support of Mot. for Summ. J., 1 n.1, ECF No. 78. The Secretary, who directed the report's preparation and specifically described the methods to be used and sources to be consulted, did not ask the AS-IA for additional information after it was prepared and thus clearly found the report sufficient to meet her informational needs. Plaintiffs' argument that this Court should invalidate the report for failing to make a "recommendation" regarding certain matters, Pls.' Reply 22, asks for relief the APA does not authorize. *Perez v. Mtg. Bankers' Ass'n*, -- U.S. --, 135 S. Ct. 1199, 1207 (2015) (the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness.") (citing *Fox Television Stations, Inc.*, 556 U.S. at 513).

---

[13] 40 C.F.R. §1505.2(b). As the Secretary's memorandum requesting the report anticipates, the report is only one of several documents reviewed. AR235533 (to make final decision on exchange, Secretary will "consider the full record before the Department, including the final [EIS]," report, and other information). Significantly, the Secretary also considered public meetings she personally conducted in King Cove and Cold Bay, in which she had the opportunity to hear from the some of the residents previously consulted by the AS-IA.

*Agdaagux Tribe of King Cove v. Jewell*, 3:14-cv-110-HRH, DEFS.' REPLY MEM. IN
SUPPORT OF CROSS MOT. FOR SUMM. J.    12
`

NEPA requires only that a reviewing court "make a pragmatic judgment whether [a NEPA document's] form, content and preparation foster both informed decision-making and informed public participation." *Block*, 690 F.2d at 761 (citation omitted). Here, the report and EIS satisfied and exceeded NEPA's requirements by fostering informed decision-making and public participation that went beyond the review of environmental impacts NEPA mandates and examined medical and social issues of importance to the local communities. These issues – which are important concerns for the Department of the Interior even though they are not even mentioned in OPLMA's list of subjects to be treated in the EIS – were analyzed fully and considered in the FWS's decision-making process.

## CONCLUSION

Based on the information in the EIS and other record documents, including information gathered at over 130 meetings and through thousands of public comments, and after weighing the appropriate considerations of public policy, the Secretary selected an alternative that "preserves the integrity of the Izembek Refuge and Izembek Wilderness, ensures continued protection of unique and internationally recognized habitats, and maintains the integrity of designated wilderness." AR220126. The alternative chosen – which was consistent with at least three viable transportation alternatives for King Cove residents -- best achieved the Refuge's purposes, "the mission of the Service[,] and the goals of Congress in ANILCA." *Id.* Those authorities were properly considered under NEPA and OPLMA and support the Secretary's decision. Because the FWS's analysis complied fully with NEPA's requirements, and because neither the Secretary's decision nor the procedures used to reach it was "arbitrary and capricious," FWS is entitled to summary judgment.

Respectfully submitted this 22nd day of April, 2015.

> KAREN L. LOEFFLER
> United States Attorney
>
> RICHARD L. POMEROY
> Assistant U.S. Attorney
> Federal Building & U.S. Courthouse
> 222 West Seventh Avenue, #9, Rm. 253
> Anchorage, Alaska 99513-7567
> Telephone: (907) 271-5071
> Facsimile: (907) 271-2344
> Richard.Pomeroy@usdoj.gov
>
> JOHN C. CRUDEN
> Assistant Attorney General
> Environment and Natural Resources Division
>
> /s/ Stacey Bosshardt
> STACEY BOSSHARDT, Senior Trial Attorney
> Natural Resources Section
> P.O. Box 7611
> Washington, D.C. 20044-7611
> (202) 514-2912
> (202) 305-0506 (fax)
> stacey.bosshardt@usdoj.gov
>
> *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to D.Ak. L.R. 5.3(f)(2), this document will be served via Electronic Case Filing on all counsel of record in this case.

> /s/ Stacey Bosshardt
> STACEY BOSSHARDT