IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


AGDAAGUX TRIBE OF KING COVE, et al.,　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiffs,　　)
　　　　　　　　　　　　　　　　　　　)
　　and　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
STATE OF ALASKA,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Intervenor-Plaintiff,　)
　　　　　　　　　　　　　　　　　　　)
　　vs.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　No. 3:14-cv-0110-HRH
SALLY JEWELL, Secretary of the　　　　)
Department of the Interior, et al.,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Defendants,　　)
　　　　　　　　　　　　　　　　　　　)
　　and　　　　　　　　　　　　　　　)　　　O R D E R
　　　　　　　　　　　　　　　　　　　)
FRIENDS OF ALASKA NATIONAL　　　　)
WILDLIFE REFUGES, et al.,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Intervenor-Defendants.　)
_____)


Cross-Motions for Summary Judgment

　　Plaintiffs and intervenor-plaintiff move for summary judgment.[1]　This motion is
opposed and defendants and intervenor-defendants cross-move for summary judgment.[2]
The cross-motions are opposed.[3]　Oral argument was not requested and is not deemed
necessary.

---

[1]Docket No. 77.

[2]Docket Nos. 82, 83, 84 & 85.

[3]Docket No. 86.

Plaintiffs are the Agdaagux Tribe of King Cove, the Native Village of Belkofski, the King Cove Corporation (KCC),[4] the Aleutians East Borough, the City of King Cove, Etta Kuzakin, and Leff Kenezuroff.[5] Intervenor-plaintiff is the State of Alaska. Defendants are Sally Jewell, the Secretary of the Department of Interior; Kevin Washburn, Assistant Secretary for Indian Affairs; Michael J. Bean, Acting Assistant Secretary for Fish Wildlife and Parks; Dan Ashe, Director, United States Fish and Wildlife Service; Geoff Haskett, Regional Director, United States Fish and Wildlife; and Doug Damberg, Manager, Izembek National Wildlife Refuge. Intervenor-defendants are Friends of Alaska National Wildlife Refuges, Defenders of Wildlife, Wilderness Watch, Center for Biological Diversity, The Wilderness Society, the National Audubon Society, the National Wildlife Refuge Association, and the Sierra Club.

The City of King Cove ("King Cove") is located on the Alaska Peninsula, which separates the Pacific Ocean from Bristol Bay, an arm of the Bering Sea. King Cove has 938 residents, of whom more than one third are Alaska Natives.[6] King Cove is one of the communities within the Aleutians East Borough (AEB). Another community within the AEB is Cold Bay. Cold Bay is a small community located approximately 18 miles from King Cove and home to the only all-weather airport in the vicinity of King Cove. Both King Cove and Cold Bay are accessible only by air and sea.

King Cove and Cold Bay are both located within the Izembek National Wildlife Refuge, which was established in 1980 as part of the Alaska National Interest Lands Conservation Act (ANILCA). The Izembek National Wildlife Refuge was established

---

[4]See attached Appendix of Acronyms.

[5]The first five plaintiffs are referred to collectively by the plaintiffs as the King Cove Group (KGC).

[6]Admin. Rec. at 182000.

> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonoids;
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
> (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
> (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

Pub. L. 96-487 (HR 39), Title III § 303(3) (Dec. 2, 1980). "The Izembek Wildlife Refuge is important largely to the millions of waterfowl and shorebirds which rest and feed there for several months during spring and fall migrations." S. Rep. 96-413 at 221-222 (1979), reprinted in 1980 U.S.C.C.A.N. 5070 at 5165-66 (1980). "The world-famous eelgrass beds of the Izembek Lagoon ... attract the largest concentration of migratory birds. At times the entire world population of several species such as black brant and emperor geese can be found in these areas." Id. at 179. "Izembek Refuge also has the only non-migratory population of Tundra Swans in the world."[7] "Other waterfowl species rely on the wetlands as well as the lagoons – including Steller's Eiders, the U.S. population of which is threatened. A significant percentage of the world's population of these birds (up to 40% at times) winter on the Refuge."[8] The Refuge is also home to "abundant brown bears, caribou and wolves" and "[b]etween 10,000 to 15,000 sea otters inhabit the waters off Izembek." S. Rep. 96-413 at 222. "Ringed, bearded, harbor and fur seals, walrus, beluga whales and porpoises also frequent these waters." Id. "Four species of salmon, dolly varden[] and rainbow trout inhabit streams and lakes and king crabs, halibut and razor clams are abundant in lagoons and offshore waters." Id. "In 1986, the Izembek Refuge received global attention as one of the first U.S. sites to be designated a 'Wetland of

---

[7]Admin. Rec. at 220113.

[8]Admin. Rec. at 220114.

International Importance' by the Ramsar Convention on Wetlands of International Importance."[9]

"The idea of a road connecting King Cove and Cold Bay has been discussed since at least the 1980's."[10] "Residents of King Cove community have long expressed interest in a road to improve access to Cold Bay and its airport for personal, medical, and commercial purposes."[11] Plaintiffs allege that "[t]he road would provide safe, reliable, and affordable access from King Cove to the Cold Bay Airport to allow medical evacuations from King Cove to Anchorage, particularly when wind and wave conditions make air and boat travel dangerous or highly uncomfortable for medical evacuees."[12]

"In 1999 Congress passed the King Cove Health and Safety Act (Section 353) of the Consolidated and Emergency Supplemental Appropriations Act of 1999 (Public Law 105-277)...."[13] Under the Act, "$20 million was provided to construct a road-hovercraft link between King Cove and Cold Bay, $15 million was for improvements to the King Cove airstrip, and $2.5 million was for a major renovation of the King Cove health clinic."[14] "In 2006, the Aleutians East Borough constructed a one-lane gravel road from the King Cove airstrip to a temporary hovercraft dock four miles away where a hovercraft ... carrie[d] up

---

[9]Admin. Rec. at 220111.

[10]Admin. Rec. at 220111.

[11]Admin. Rec. at 220111.

[12]Complaint [etc.] at 8, ¶ 22, Docket No. 1. Plaintiffs allege that "[e]leven persons have been killed since 1980 while traveling during bad weather from King Cove to the Cold Bay airport and from Cold Bay and Kodiak to King Cove. Id. at ¶ 23.

[13]Id. at 7, ¶ 19.

[14]Izembek and Alaska Peninsula Refuge and Wilderness Enhancement Act of 2007: Hearing on S. 1680 Before the Subcomm. on Public lands and Forests of the U.S. Senate Committee on Energy and Natural Resources (113th Cong. 2008) (testimony of Henri Bisson, Acting senior advisor to the Secretary for Alaska Affairs, Department of the Interior).

to 49 passengers, an ambulance, and cargo to and from Cold Bay."[15] "This marine-road system was the preferred alternative evaluated in a 2003 Final Environmental Impact Statement completed by the Army Corps of Engineers."[16] "King Cove residents, however, continue[d] to seek a road linking their community with Cold Bay due to concerns about the reliability of the hovercraft in severe weather and uncertainty about future funding for the operational costs associated with the hovercraft."[17] And in fact, the hovercraft service was discontinued in 2011 by the AEB due to "cost and reliability concerns[.]"[18] In its years of operation from 2007-2011, the hovercraft was used to complete 22 medical evacuations.[19]

"In 2009 Congress passed the Omnibus Public Land Management Act of 2009 (Public Law 111-11), Title VI, Subtitle E (OPLMA)...."[20] The OPLMA "authorized the Secretary of the Interior to exchange lands within the Izembek National Wildlife Refuge for lands owned by the State of Alaska and the King Cove Corporation for the purpose of constructing a single lane gravel road between the communities of King Cove and Cold Bay, Alaska."[21] More specifically, Section 6402(a) of the OPLMA provided:

> Upon receipt of notification by the State and the Corporation of the intention of the State and the Corporation to exchange the non-Federal land for the Federal land, subject to the conditions and requirements described in this subtitle, the Secretary may convey to the State all right, title, and interest of the United States in and to the Federal land. The Federal land

---

[15]Id.

[16]Id.

[17]Id.

[18]Admin. Rec. at 220112.

[19]Admin. Rec. at 220112.

[20]Complaint [etc.] at 8, ¶ 20, Docket No. 1.

[21]Admin. Rec. at 220112. The proposed land exchange was "206 acres of federal land in the Izembek National Wildlife Refuge for 56,393 acres of State of Alaska and King Cove Corporation owned land[.]" Complaint [etc.] at 5, ¶ 12(a), Docket No. 1.

within the Refuge shall be transferred for the purpose of constructing a single-lane gravel road between the communities of King Cove and Cold Bay, Alaska.

Pub. L. 111-11, Title VI, Subtitle E, § 6402(a). The OPLMA provided that the road "shall be used primarily for health and safety purposes (including access to and from the Cold Bay Airport)...." Id. § 6403(a)(1)(A).

"On determining whether to carry out the land exchange" the Secretary was required to comply with the National Environmental Policy Act of 1969 (NEPA) and "any other applicable law (including regulations)." Id. § 6402(b)(1). Any NEPA analysis was to contain--

> (i) an analysis of--
>
>> (I) the proposed land exchange; and
>>
>> (II) the potential construction and operation of a road between the communities of King Cove and Cold Bay, Alaska; and
>
> (ii) an evaluation of a specific road corridor through the Refuge that is identified in consultation with the State, the City of King Cove, Alaska, and the Tribe.

Id. § 6402(b)(2)(B). The OPLMA provided that certain entities "may participate as ... cooperating" agencies "[d]uring the preparation of the environmental impact statement...." Id. § 6402(b)(3)(A). Entities entitled to participate as cooperating agencies included the State, the AEB, King Cove, and the Agdaagux Tribe. Id. § 6402(b)(3)(B).

After the OPLMA was enacted, the Secretary directed the United States Fish and Wildlife Service (FWS) to prepare an environmental impact statement (EIS) for the proposed land exchange/road corridor. A notice of intent to prepare an EIS was published on August 6, 2009 and a "revised Notice of Intent was published on February 24, 2010 ... to announce the public scoping meetings and invite suggestions on the scope of issues to

be addressed in the EIS."[22] "Seven public scoping meetings were conducted in March and April 2010 in Washington, D.C. and Anchorage, Alaska, as well as Cold Bay, False Pass, King Cove, Nelson Lagoon, and Sand Point, Alaska."[23]

The FWS developed and analyzed five alternatives for the proposed land exchange/road corridor: 1) the no action alternative, 2) the land exchange and southern road alignment alternative, 3) the land exchange and central road alignment alternative, 4) the hovercraft operation alternative, and 5) the Lenard Harbor Ferry with Cold Bay Dock improvements alternative.

On November 15, 2011, Stanley Mack, the mayor of the AEB, advised the FWS that

> [a]fter another detailed analysis of the financial costs of the Borough's hovercraft, we have concluded that it is not financially feasible or responsible to authorize the re-start of King Cove - Cold Bay hovercraft operations. For more than three years the hovercraft was in operation, it required an annual operating subsidy in excess of $1 million from the Borough's general fund. This amount of annual funding is not sustainable or realistic for a remote, regional local government consisting of six communities with a population of 2500.[24]

Thus, Mack recommended that the "Izembek Land Exchange EIS consultant team ... amend Alternative 1 (No Action) in the PDEIS to document there will be no resumption of hovercraft service in the foreseeable future."[25]

On February 24, 2012, Mack wrote to the Corps of Engineers to provide it with "information ... about the recent announcement by the ... AEB regarding its decision not to operate the hovercraft between the Northeast Corner and Cross Wind Cove or other Cold

---

[22]Admin. Rec. at 220124.

[23]Admin. Rec. at 220124.

[24]Admin. Rec. at 184023.

[25]Admin. Rec. at 184023.

Bay location."[26] Mack advised that "[i]f the Secretary does not approve the land exchange, the AEB will develop an alternative transportation link between King Cove and Cold Bay. Any alternative we develop will include the utilization of the road to Northeast Corner and associated facilities, now being constructed under the King Cove Health and Safety Act and COE Permit #2-2000-0300 Cold Bay 12."[27] Mack further advised that

> [a] transportation link the Borough is exploring (and we believe holds promise) is an aluminum landing craft/passenger ferry. Please see the attached conceptual drawing. The Borough hopes that this type of a transportation link could be more technically and financially viable than a hovercraft. Such a landing craft/passenger ferry vessel could be designed to carry approximately 30 passengers, occasional wheeled vehicles (in particular an ambulance) and limited cargo. It could use the same route as has been described for the hovercraft in the past. We are looking at building materials and techniques, such as hardening the vessel bottom with replaceable UHMW wear pad to prevent damage to the hull from abrasion on the landing pad, that allow the vessel to use the landing pad at the Northeast Corner which is to be constructed in accordance with the existing plans, specs and permits.[[28]]

A draft EIS (DEIS) was published and made available for public comment on March 19, 2012. The DEIS discussed the five alternatives set out above. Public testimony on the the DEIS was taken at five public meetings held in Anchorage, Cold Bay, King Cove, and Sand Point.[29] The FWS "received a total of 71,960 submissions on the [DEIS], of these 1,849 were considered unique."[30] 70,111 form letters opposing a road were received, and 390 submissions in support of a road were received.[31]

---

[26] Admin. Rec. at 184025.

[27] Admin. Rec. at 184026.

[28] Admin. Rec. at 184026.

[29] Admin. Rec. at 220124.

[30] Admin. Rec. at 220124.

[31] Admin. Rec. at 220124.

On April 18, 2012, the FWS contacted the AEB for additional information about the "aluminum landing craft/passenger ferry" because this "information is needed to update the No Action Alternative in the Izembek NWR Land Exchange/Road Corridor EIS. The No Action Alternative must describe what would occur if the U.S. Fish and Wildlife Service takes no action in this EIS."[32] The FWS asked where the landing craft would be moored when not in service, whether "the footprint [will] change at the proposed hovercraft landing location at the Northeast Terminal or at Cross Wind Cove[,]" what the vessel's specifications and estimated operability limits were, what the estimated costs of the vessel were, and what the proposed timeline for purchase and implementation was.[33]

On July 9, 2012, Mack responded that "the AEB can provide no further information on this potential project which remains in early consideration by the AEB."[34] In their comments on the DEIS, the KCG wrote that

> the AEB has outlined a conceptual plan for an aluminum landing craft that might be modified to allow the vessel to use the landing pads at the northeast corner and at Cross Wind Cove. It must be noted that this conceptual plan IS only a concept. There is no vessel and the concept will only be explored further if and only if the Secretary does not find the land exchange is in the public interest.[[35]]

The KCG further advised the FWS that

> [t]he concept of a landing craft is simply that: a concept.... This ongoing research was previously suggested for the King Cove to Cold Bay link as simply a POTENTIAL consideration should the Izembek land exchange not be approved. Furthermore, there has been no public discussion of this concept and whether it would be viable and acceptable to the public.
>
> * * *

---

[32]Admin. Rec. at 184032.

[33]Admin. Rec. at 184032.

[34]Admin. Rec. at 184034.

[35]Admin. Rec. at 184733.

> Consequently, there is no predictability that the conceptual craft proposed in the USFWS No Action Alternative will work and therefore no predictability of how service will be provided or what the costs will be to acquire and operate such a craft. Consequently, no description of this craft can or should be included in a No Action Alternative.[36]

In their October 24, 2012, comments on the PEIS, the KCG stated that

> [t]he [FWS] has unilaterally determined to include a conceptual landing craft operating from existing and authorized facilities at the Northeast and Cross Wind terminals. To be consistent with NEPA, the KCG strongly recommends the [FWS] also include a new alternative that includes the conceptual landing craft with required modifications to existing authorizations in the same manner as the ferry alternative that would require new authorizations from the State and the Corps.[37]

On February 6, 2013, the final EIS (FEIS) was published and made available for public comment. The FEIS stated that the "basic" purpose of the proposed project "is to provide a transportation system between the City of King Cove and the Cold Bay Airport" and that the "overall" purpose of the proposed project "is to construct a long term, safe, and reliable year round transportation system between the cities of King Cove and Cold Bay."[38] The FEIS listed the "need[s] for the proposed action" as 1) Health and Safety, 2) Quality of Life and 3) Affordable Transportation.[39] The FEIS acknowledged that these needs were "broader than the focused purpose specified in the" OPLMA,[40] which stated that the purpose of the land exchange, if approved, was "constructing a single-lane gravel road" between King Cove and Cold Bay. OPLMA § 6402(a). The FEIS analyzed the impacts of the five alternatives set out above. The hovercraft and ferry alternatives were

---

[36]Admin. Rec. at 136196.

[37]Admin. Rec. at 129555.

[38]Admin. Rec. at 32895.

[39]Admin. Rec. at 32896.

[40]Admin. Rec. at 32896.

considered at the request of the Corps of Engineers, which was a cooperating agency.[41]

In their March 13, 2013 comments to the FEIS, the KCG stated that the FEIS was deficient because it failed

> to use available information about operability of the conceptual landing craft developed by the EIS consultant for the Service to provide: 6 day a week, ... year-round ability to meet scheduled air service at the Cold Bay Airport; and for 24/7 ability to provide transportation for urgent medical care and for emergency medical evacuation. The 2003 King Cove Access Project provided ... data that were incorporated by the Service in the DEIS and FEIS includ[ing] known wind and wave conditions in Cold Bay and at the Northeast and Cross Wind Cove Terminal as well as the physical and biological factors associated with the terminals. Although used in the DEIS and FEIS for reliability conclusions for the road, hover-craft and ferry alternatives, the Service chose not to validate the key FEIS assumption that no in-water modifications are required for the conceptual landing craft to provide safe and reliable loading and unloading of an ambulance, passengers, and other vehicles.[42]

On March 21, 2013, the Secretary directed Kevin Washburn, the Assistant Secretary of Interior for Indian Affairs (AS-IA), "to hold additional government-to-government consultations," to "tour the area to assess the medical evacuation benefits from the proposed road," and to "provide a report to the Secretary of the Interior."[43] "In preparing the report, the Assistant Secretary will address whether and to what extent the road is needed to meet medical emergency requirements of King Cove. The report should specifically address, after consultation with the Indian Health Service, the emergency medical needs of King Cove."[44] Washburn visited the King Cove area on June 26-29, 2013 and prepared a report that was dated October 28, 2013. Washburn wrote that the

---

[41]Admin. Rec. at 147307.

[42]Admin. Rec. at 200534-35.

[43]Admin. Rec. at 235532.

[44]Admin. Rec. at 235532.

"directive was to assess the medical evacuation benefits of the proposed road. Our methodology was prescribed: a visit to the King Cove community, tribal consultation, and consultation with experts."[45] Washburn wrote that

> [w]e engaged in active listening to understand the views of the tribal entities involved here. We viewed our task not to produce a 'balanced' report as to the merits of the road issue overall because we were asked to focus only on one important aspect of the road issue and were instructed to consult only with the relevant tribal communities and medical experts. We believe that this report fairly presents the tribal views in this decision making process and thus meets the Administration's consultation duties under the trust responsibility.[[46]]

Washburn then summarized the information that was gathered during the consultation regarding the difficulties of traveling in and out of King Cove for medical treatment, both emergency and non-emergency treatment. Washburn noted in his report that King Cove "strongly supports the road alternative."[47]

On March 21, 2013, the Secretary also indicated that he would "hold an official meeting in King Cove and receive written and oral testimony on the medical evacuation benefits of the proposed road."[48] On August 30, 2013, the Secretary traveled to King Cove and Cold Bay for community meetings.

On December 23, 2013, the Secretary published the Record of Decision (ROD). "[T]he Department ... decided to adopt the 'no action' alternative in the EIS. This alternative declines the offered land exchange for road construction and includes a description of a proposal for a landing craft/passenger ferry that could use the road that

---

[45]Admin. Rec. at 235526.

[46]Admin. Rec. at 235527.

[47]Admin. Rec. at 235530.

[48]Admin. Rec. at 235532.

has been constructed to the Northeast Terminal on the border of the Refuge."[49]   The

Secretary explained that

> [t]he EIS shows that construction of a road through the
> Izembek National Wildlife Refuge would lead to significant
> degradation of irreplaceable ecological resources that would
> not be offset by the protection of other lands to be received
> under an exchange.... [B]ecause reasonable and viable trans-
> portation alternatives exist to meet the important health and
> safety needs of the people of King Cove, the final decision of
> the Department is to adopt the no action alternative as de-
> scribed in the EIS.[50]

The Secretary stated that

> [w]hile there are examples on other conservation system units
> of wildlife and roads co-existing, the EIS documents that uses
> of the habitat of the Izembek Refuge by the large number of
> species that are dependent on the isthmus would be irrevers-
> ibly and irretrievably changed by the presence of a road.
> Construction of a road in this roadless area would bring
> increased human traffic, noise, hydrological changes, damage
> to wetlands, run off, introduction of contaminants, and
> invasive species.  Once a road is in place there would be a
> certainty of increased human access and activity.  Year-round
> and increased human access radiating off the road corridor via
> pedestrian traffic or all-terrain vehicles coupled with the
> physical impacts caused by predictable all-terrain vehicle use
> on wet soils made possible by the presence of the road would
> have profound adverse effects on wildlife use and habitats of
> the narrow isthmus that comprises the Refuge.  The likely
> increased activity associated with the road would also place a
> strain on Refuge management at a time of decreasing Refuge
> budget and capacity.[51]

The Secretary acknowledged that the FWS

> would have a net gain of over 55,000 acres for the National
> Wildlife Refuge System under the proposed exchange and the
> parcels proposed to be received by the Service in the exchange
> include notable resource values such as caribou habitat, brown
> bear habitat, and Tundra Swan nesting habitat.  Some of the
> parcels to be received would be included within the Izembek

---

[49]Admin. Rec. at 220108.

[50]Admin. Rec. at 220109.

[51]Admin. Rec. at 220110.

Wilderness boundary. However, the Service has determined that the increased acreage would not compensate for the overall values of existing Izembek Refuge lands and Wilderness that would be removed. Nor would the offered lands compensate for the anticipated impacts that the proposed road would have on wildlife and the habitat that surround the road corridor. The lands offered for exchange contain important wildlife habitat, but they do not provide the wildlife diversity of the internationally recognized wetland habitat that is proposed for the exchange, nor would they compensate for the adverse effects of removing a corridor of land and constructing a road within the narrow, irreplaceable Izembek isthmus. Further, the lands proposed for exchange are not likely to be developed, if retained in their current ownership, in ways that would affect the same resources that would be affected by the construction and operation of a road through the Izembek Refuge. Thus, a conveyance of these lands to the United States does not actually offset the environmental impacts from the proposed road construction and operation.[52]

As for the transportation alternatives, the Secretary explained that

[t]he administrative record shows that there are viable alternatives to a road that would provide for the continued health and safety of King Cove residents. The Borough has indicated to the U.S. Army Corps of Engineers that, if the road through the Refuge is not approved, it will consider developing an alternative transportation link in the form of an aluminum landing craft/passenger ferry between Northeast Terminal ... which is at the end of the road that has now been completed ... and the Cold Bay Airport. According to the Borough, the landing craft "... holds promise..." and could be more technically and financially viable than a hovercraft. It also would traverse a shorter eight mile distance across Cold Bay than what the hovercraft had successfully traversed when it was in service. Analysis of Alternative 5, including improvements to the harbor facilities at Cold Bay, also serves as an update to the 2003 EIS and is available for use in development of actions to address that long-standing need. Thus, while a marine link may not be preferred by proponents of the road, viable and reliable options to a road exist to meet the public health and safety needs of the King Cove residents.[53]

---

[52]Admin. Rec. at 220114-15.

[53]Admin. Rec. at 220117 (citation omitted).

The Secretary stated that

> "[i]n a February 24, 2012 letter to the Corps, the Borough has indicated that it will explore the option of using an aluminum landing craft/ferry to provide a marine-road link between the Northeast Terminal and Cross Wind Cove if the land exchange is not approved. The vessel described by the Borough is a 59-foot by 16-foot landing craft.... According to the Borough, the vessel could accommodate approximately 30 passengers, occasional vehicles/ambulances, and limited cargo. The vessel bottom would be hardened with replaceable wear pads to prevent damage to the hull from abrasion, allowing the vessel to use the former hovercraft terminals. The vessel would operate between the Northeast Terminal and Cross Wind Cove, the same route analyzed in the 2003 EIS. Neither the February 24, 2012 letter to the Corps, nor subsequent correspondence with the Borough contain any description of the frequency of service being considered nor the costs associated with the acquisition and operation of a landing craft/passenger ferry.[54]

On June 4, 2014, plaintiffs commenced this APA action in which they challenge the Secretary's adoption of the No Action Alternative. On July 21, 2014, the State of Alaska's motion to intervene as a plaintiff in this matter was granted,[55] and on July 29, 2014, the State filed its complaint in intervention.[56] Plaintiffs and intervenor-plaintiffs asserted the same five claims for relief in their complaints: 1) a claim alleging that the Secretary violated the OPLMA in a variety of ways, 2) an APA claim, 3) a NEPA claim, 4) an ANILCA claim, and 5) a claim that defendants violated the trust responsibility the federal government has to American and Alaska Native citizens. On December 19, 2014, the court dismissed[57] the portion of plaintiffs' and intervenor-plaintiff's OPLMA claims that were based on allegations that the Secretary failed to make a public interest determination and their APA, ANILCA, and trust claims.

---

[54]Admin. Rec. at 220118-19.

[55]Docket No. 11.

[56]Docket No. 40.

[57]Order re Motions to Dismiss at 25, Docket No. 71.

Plaintiffs and intervenor-plaintiff now move for summary judgment on their remaining claims. Defendants and intervenor-defendants cross-move for summary judgment on plaintiffs' and intervenor-plaintiffs' remaining claims.

Discussion

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" City & County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985)). "'[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co., 753 F.2d at 769).

"Judicial review of agency decisions under [the OPLMA] and NEPA is governed by the Administrative Procedure Act ('APA'), which specifies that an agency action may be overturned only where it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1065 (9th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). "The scope of review is narrow, but 'the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1193 (9th Cir. 2008) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

An agency rule would normally be arbitrary and capricious if:

> "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem,

> offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Id. (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43). More specifically for NEPA claims, the court's "task 'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" Assoc. of Public Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1183 (9th Cir. 1997) (quoting Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97–98 (1983)). "Alternatively phrased, the task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir. 2004).

Standing

As an initial matter, defendants argue that plaintiffs (which hereinafter includes both plaintiffs and plaintiff-intervenor) lack standing to bring their NEPA claims. "[I]n addition to constitutional standing requirements, under the APA a plaintiff must assert an interest 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Nevada Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 715-16 (9th Cir. 1993) (quoting Ass'n of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 153 (1970)). "[T]o assert a claim under NEPA, a plaintiff must allege injury to the environment[.]" Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric., 415 F.3d 1078, 1103 (9th Cir. 2005).

In their earlier motion to dismiss, defendants argued that plaintiffs lacked standing because the interests that plaintiffs were claiming had been injured involved health and safety concerns, not environmental injury. The court rejected this argument because plaintiffs had alleged health and safety concerns that had a connection to the physical

environment.[58]  In particular, the court relied on the fact that plaintiffs had alleged that the Secretary had overstated the adverse impacts that the road alternatives would have on the physical environment.[59]  Defendants now argue, however, that plaintiffs' motion for summary judgment clearly shows that plaintiffs' health and safety concerns are insufficiently related to the physical environment to fall within NEPA's zone of interests.

Defendants argue that plaintiffs are seeking to promote the health and safety interests of the residents of King Cove but that their NEPA claims will not serve these ends because "NEPA was not intended to provide a process for addressing social and economic shortcomings in our society, but to ensure that agencies consider the consequences of their actions on the land, air, water, and other natural resources upon which our society depends."  Morris v. Myers, 845 F. Supp. 750, 757 (D. Or. 1993).  Defendants contend that the sole argument plaintiffs make that relates to environmental impacts is that the FWS did not adequately consider adverse impacts to State and KCC lands that would result if the Secretary decided not to implement the proposed land exchange.  Defendants contend that any such impacts would be inflicted by plaintiffs themselves.  Defendants insist that plaintiffs cannot rely on alleged environmental injuries that would be self-inflicted in order to show that they fall within NEPA's zone of interest.

The court again finds that plaintiffs' interests fall within NEPA's zone of interests. Amongst the plaintiffs are owners of the lands subject to possible exchange pursuant to the OPLMA.  That status allows at least those owners standing to question the Secretary's evaluation of the offered lands in comparison to the threatened lands.  Moreover, Congress expressly recognized in the OPLMA that the State of Alaska and King Cove had sufficient interests in the road proposal that they were designated as "cooperating agencies" for

---

[58]Order re Motions to Dismiss at 17, Docket No. 71.

[59]Id. at 17-18.

purposes of the NEPA proceedings. That designation would have greatly diminished value if the cooperating agencies could not seek review of the Secretary's NEPA decision.

<u>The Landing Craft Arguments</u>

Plaintiffs argue that the Secretary's determination that a landing craft was a reasonable and viable transportation alternative was arbitrary and capricious. Plaintiffs contend that the <u>only</u> transportation alternative that the Secretary was relying on is the landing craft that was conceptualized by the FWS. But plaintiffs argue that a landing craft transportation alternative was never developed as a separate and distinct alternative during the NEPA process. Plaintiffs contend that the only discussion of the landing craft during the NEPA process was a very general discussion of a concept and that this discussion was limited to a portion of the "no action" section of the FEIS. Plaintiffs contend that the FEIS admits that there was insufficient information to develop the landing craft as a separate alternative.

In the Alternative 1 discussion in the FEIS, it was noted that the AEB had "indicated it is exploring an aluminum landing craft/passenger ferry to provide a marine-road link between the Northeast Terminal and Cross Wind Cove if the land exchange is not approved[.]"[60] The FEIS then explained that

> [t]he Aleutians East Borough has identified the general dimensions, passenger capacity, and type of craft they are exploring. The Aleutians East Borough has not, however, identified the frequency of operations it would offer, the specifics on design of a vessel beyond its general dimensions and likely carrying capacity, or the timeline for when a landing craft could become operational in the future, as this marine service would only be offered in lieu of a road connection between the communities of King Cove and Cold Bay. Without those specifics, the Service does not have complete data regarding the reasonably predictable actions of the

---

[60]Admin. Rec. at 181132.

> Aleutians East Borough to develop this mode of transportation
> if the land exchange does not occur.[61]

Because the FWS did not have the specifics about the proposed landing craft alternative, it made "assumptions" and "supplemented" the information that the AEB had provided "with information provided by manufacturers of a landing craft similar to that generally described by" the AEB.[62] But plaintiffs argue that none of this information was given the required "hard look" to determine if the landing craft really was a viable transportation alternative. Plaintiffs insist that if the Secretary were going to support her selection of the No Action Alternative on the basis of the landing craft being a viable and reliable transportation alternative, she needed to prepare a supplemental EIS (SEIS) in which the landing craft was fully developed as an alternative. Because the Secretary did not prepare an SEIS, plaintiffs argue that the landing craft alternative remained a viable, but unexamined alternative, which violates NEPA. See Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."). Although plaintiffs maintained during the NEPA process (and continue to maintain) that the landing craft was not a viable alternative, they argue that because the Secretary treated it as a viable alternative, NEPA required that she analyze this alternative as a stand-alone alternative in the FEIS or prepare an SEIS.

The foundation of the foregoing arguments is plaintiffs' contention that, in the ROD, the Secretary concluded that a landing craft was a reasonable and viable transportation alternative. Plaintiffs are wrong. The Secretary reached no such conclusion.

---

[61]Admin. Rec. at 181132.

[62]Admin. Rec. at 181132.

A major subdivision of the ROD is titled "Viable Transportation Alternatives."[63] After discussing the need for safe transportation to medical services, the ROD reports that "[m]edical evacuations from King Cove have occurred by air, boat, and Alaska Marine Highway System ferry...."[64]  This discussion makes mention of an available hovercraft, observing that "[a]ir, hovercraft and ferry may be more expedient than driving [on the proposed road] between 75 and 95 percent of the time, depending on the alternative."[65] The ROD finds that "[t]he administrative record shows that there are <u>viable alternatives</u> to a road that would provide for the continued health and safety of King Cove residents."[66] It is in this context that the Secretary observes that

> [t]he Borough has indicated to the U.S. Army Corps of Engineers that, if the road through the Refuge is not approved, it will consider developing an alternative transportation link in the form of an aluminum landing craft/passenger ferry between Northeast Terminal – which is at the end of the road that has now been completed – and the Cold Bay Airport. According to the Borough, the landing craft "... holds promise ..." and could be more technically and financially viable than a hovercraft.[[67]]

This discussion concludes with the observation that "[t]hus, while a marine link may not be preferred by proponents of the road, viable and reliable options to a road exist to meet the public health and safety needs of the King Cove residents."[68]

Again, the Secretary has not concluded that a landing craft is a viable alternative to a road.  The landing craft is being "considered" by the AEB.  The AEB – not the Secretary

---

[63]Admin.  Rec. at 220116.

[64]Admin. Rec. at 220116.

[65]Admin. Rec. at 220116.

[66]Admin. Rec. at 220117 (emphasis supplied).

[67]Admin. Rec. at 220117.

[68]Admin. Rec. at 220117.

– has characterized a landing craft as "holding promise." While the Secretary has observed that a landing craft might be preferable to the use of a hovercraft, plaintiffs are simply wrong when they argue that the Secretary has arbitrarily determined that a landing craft was a reasonable and viable transportation alternative.

The No Action Alternative, which the Secretary favored in the ROD, is a decision that the status quo which poses no threat of environmental damage is preferable to the road construction alternatives that the evidence and the record shows may result in substantial environmental damage not mitigated by the proposed land exchanges. At present, King Cove residents experiencing medical emergencies requiring transportation have available to them air travel and marine travel by fishing vessel, state ferry, or hovercraft (if use of that vehicle is reactivated). The present state of things is that there is no landing craft available, and the Secretary's decision is not based upon an assumption that a landing craft will become available. That may or may not happen, as the ROD suggests.

Subsidiary to plaintiffs' argument that the Secretary wrongly determined that a landing craft was a viable and reasonable transportation alternative, plaintiffs argue that the Secretary should have required preparation of an SEIS. An agency must prepare an SEIS if

> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1).

Introduction of the landing craft alternative by the AEB into the proceedings did not require preparation of an SEIS. The possibility of a landing craft as an alternative to the extant but presently unused hovercraft was not a substantial change in the No Action

Alternative. Neither a hovercraft nor the proposed landing craft were shown to have any environmental impact. Although neither of the two modes of marine transportation are in operation, they would be functionally equivalent. Discussion of the landing craft as a potential alternative was not a substantial change in the No Action Alternative.

Plaintiffs next argue that the Secretary's decision that the landing craft was a viable transportation alternative is not entitled to any deference. This argument fails because the Secretary has made no such decision. There are alternatives to a road which are captured by the No Action Alternative (air travel and marine travel by fishing vessel or Alaska Marine Highway ferry), and plaintiffs do not suggest that such modes of travel are not viable. Plainly they are viable, and they are the status quo as stated in the No Action Alternative.[69]

Plaintiffs also argue that the selection of the No Action Alternative violated NEPA because the Secretary selected an alternative that did not meet the purpose and the need of the proposed project. "NEPA requires that agencies specify the purpose and need for a proposed action and analyze the environmental consequences of the proposed action as well as a reasonable range of alternative actions." Wild Wilderness v. Allen, 12 F. Supp. 3d 1309, 1325 (D. Or. 2014). "Because project alternatives derive from the stated purpose and need, the goal of a project necessarily dictates the range of reasonable alternatives." Id.

The purpose of the proposed project was to provide a road between King Cove and Cold Bay to address, in part, the health and safety needs of the residents of King Cove. Plaintiffs argue that the Secretary ignored this purpose and need when selecting the No Action Alternative. Plaintiffs make much of the fact that a draft ROD, dated March 2013, contained a "Purpose and Need" section, which provided:

---

[69]Admin. Rec. at 220118.

The purpose of the proposed land exchange, as provided in the Act, is to transfer to the State of Alaska all right, title, and interest to a road corridor that would allow the construction, operation, and maintenance of a single lane gravel road between the communities of King Cove and Cold Bay, Alaska. The proposed road would be used primarily to address health and safety issues, including reliable access to and from the Cold Bay Airport, and only for noncommercial purposes.[70]

The draft ROD then listed several "objectives" to be achieved by the purposed action, including:

- Providing a safe, reliable, affordable transportation system between the City of King Cove and the airport in Cold Bay, Alaska;
- Addressing health and safety issues for King Cove residents, including timely emergency medical evacuations when needed and improved access to health care services not available in King Cove through access to the Cold Bay Airport;
- Balancing the needs of the communities, the national wildlife refuges (including wilderness), and ecosystem functions in the area;
- Transferring the minimum federal acreage necessary for the proposed road corridor;
- Developing an environmentally sensitive project design to minimize impact to wildlife, fish, plants, and their habitats, subsistence uses, wilderness character, and wetlands; and
- Selecting a road corridor that makes use of existing trails and roads to the maximum extent practicable.[71]

Plaintiffs argue that this shows that the FWS understood when they were preparing the FEIS that the purpose and the need for the project was defined by the OPLMA, but that rather than attempting to explain how the selection of the No Action Alternative met these objectives, the Secretary simply deleted the foregoing from the final ROD. Plaintiffs contend that a further illustration that the FWS and the Secretary were ignoring the purpose and the need established by Congress in the OPLMA can be found in a draft of Questions and Answers document that the FWS prepared for the FEIS. Question 11 asked:

---

[70]Admin. Rec. at 186076.

[71]Admin. Rec. at 186076.

"Why did the Service choose Alternative 1, the no action alternative, as the preferred alternative?"[72]  The answer, in part, was that the No Action Alternative "was selected because it is believed to best meet refuge purposes and the Service mission."[73]  Plaintiffs argue that this plainly shows that the FWS was ignoring the mandated purpose and need for the land exchange, which was to consider the best alternative for the health and safety of King Cove residents.  Plaintiffs also point out that defendants acknowledged in the FEIS that selection of the No Action Alternative would not meet the purpose of the proposed project and may not meet the three needs set out in the FEIS.  The FEIS provided that if the No Action Alternative were selected

> the project purpose ... would not be met because a land exchange would not be executed for the purpose of construct-ing a road as specified in the Act.  The project needs ... of health and safety, quality of life, and affordable transportation would not be met if a new mode of transportation is not implemented, but might be met by the landing craft/ferry, depending on levels of service.[74]

Plaintiffs are wrong when they argue that a No Action Alternative must meet the need and purpose of a proposed project.  In fact, "'the no action alternative generally does not satisfy the proposed action's purpose and need; its inclusion in the Environmental Impact Statement is required by NEPA as a basis for comparison.'"  California ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006) (quoting Ronald E. Bass, Albert I. Herson & Kenneth M. Bogdan, The NEPA Book: A Step–by–Step Guide on How to Comply with the National Environmental Policy Act 95 (2d ed. 2001)).  "A no action alternative in an EIS allows policymakers and the public to compare the environ-mental consequences of the status quo to the consequences of the proposed action.  The no

---

action alternative is meant to 'provide a baseline against which the action alternatives' ... [are] evaluated." Ctr. for Biological Diversity v. U.S. Dep't of Interior, 623 F.3d 633, 642 (9th Cir. 2010) (quoting Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1065 (9th Cir. 1998)). Although the purpose and need in an EIS define the range of alternatives considered by an agency, the agency's decision may be based on any relevant considerations of law or policy, as long as they are explained in the decision document. The fact that the FWS defined the need for the project broadly to include health and safety issues does not somehow enlarge the FWS's duties under NEPA. The Secretary's determination that the No Action Alternative would best achieve the Refuge's purpose, the agency's statutory mission, and Congress' intent under ANILCA was based on substantial evidence in the record.

Although plaintiffs acknowledge that a No Action Alternative is generally environmentally neutral and establishes a baseline for comparison with other alternatives, they argue that the No Action Alternative is this case was not so stated and that, as stated, the No Action Alternative purports to meet the purpose and the needs of the proposed road project. Alternative 1 – the No Action Alternative – does no such thing. As set out in the ROD, the Secretary observes that the No Action Alternative "serves as a baseline of existing impacts continued into the future against which to compare impacts of action alternatives."[75] Alternative 1 observes that "current modes of transportation between the cities of King Cove and Cold Bay include air and marine routes which continue their operations and development."[76] Alternative 1 – the No Action Alternative – does not expressly nor by implication purport to be the equivalent of the proposed addition of a roadway for purposes of accessing Cold Bay. What one can infer from Alternative 1 is that

---

[75]Admin. Rec. at 220118.

[76]Admin. Rec. at 220118.

the health and safety needs of the residents of King Cove would continue to be met as they currently are, by air and marine travel involving fishing vessels, Alaska Marine Highway System ferries, and (if reactivated) a hovercraft. Somewhat inconsistent with the AEB's suggestion for a landing craft, plaintiffs now argue that a hypothetical, untested, landing craft crossing open ocean would not be a safe or reliable means to medevac patients from King Cove to Cold Bay. That may or may not be true. But, the Secretary never found that a landing craft would be a reasonable and viable transportation alternative to extant modes of transportation.

Alternative 1, the No Action Alternative, was an appropriate statement of the status quo for purposes of establishing a baseline for comparison to other alternatives. There is no requirement that the No Action Alternative fulfill the purpose of a proposed project, nor did the OPLMA inject into the NEPA proceedings a public health or safety component. It is clear that the act does not establish a "health and safety" purpose and need for the land exchange. The OPLMA requires NEPA proceedings, and nothing more. NEPA addresses environmental impacts, not public health and safety impacts.

Finally, plaintiffs argue that the Secretary had predetermined that a road alternative would not be selected because of the Department of the Interior's long-standing aversion to a road through the Izembek National Refuge. "NEPA has no rule that an agency be 'subjectively impartial,' but the agency cannot predetermine the outcome of an environmental assessment." Friends of the Wild Swan v. U.S. Forest Serv., 875 F. Supp. 2d 1199, 1212 (D. Mont. 2012) (quoting Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000)). "'Those alleging predetermination have a high hurdle to clear. It only occurs when an agency has made "an irreversible and irretrievable commitment of resources" based upon a particular environmental outcome, prior to completing its requisite environmental analysis.'" Id. at 1213 (quoting Defenders of Wildlife v. Hall, 807 F. Supp. 2d 972, 984 (D. Mont. 2011) (quoting Metcalf, 214 F.3d at 1143)).

Plaintiffs contend that the Secretary gave four reasons in the ROD for denying the land exchange: 1) FWS has consistently found that building a road through the Refuge would create irreversible change and damage to a unique and ecologically important area, 2) a road through the Refuge would not only be inconsistent with the purposes for which the Refuge was created, but would diminish the ability of the FWS to meet the first, second, and fourth purposes, 3) selection of the No Action Alternative was consistent with the Secretary's obligations under the National Wildlife Refuge System Administration Act, and 4) construction of a road through the Refuge would lead to increased human access and activity, which would strain Refuge management resources. Plaintiffs also point out that the Secretary stated that "[n]othing is more contradictory with, or destructive to, the concept of Wilderness than construction of a road. The impact of road construction on wilderness character would radiate far beyond the footprint of the road corridor. It would irreparably and significantly impair this spectacular Wilderness Refuge."[77] Plaintiffs argue that the foregoing policy statements show that the Secretary had made up her mind to not even consider a road alternative and was ignoring the fact that in enacting the OPLMA, Congress had determined that there could in fact be a road constructed in the Izembek Wilderness.

In NEPA proceedings "'an agency can formulate a proposal or even identify a preferred course of action before completing an EIS.'" Metcalf, 214 F.3d at 1145 (quoting Ass'n of Pub. Agency Customers, 126 F.3d at 1184). In fact, the "'Council on Environmental Quality ... regulations actually encourage identification of a preferred course of action during the NEPA process....'" Id. (quoting Ass'n of Pub. Agency Customers, 126 F.3d at 1185). Plaintiffs have come forward with no evidence that the Secretary in fact and impermissibly predetermined the outcome of the instant NEPA proceedings.

---

[77]Admin. Rec. at 220115.

<u>The Land Value Arguments</u>

Plaintiffs argue that defendants failed to adequately analyze the 56,363 acres of State and Native land subject to the exchange ("the offered lands") and thus the Secretary's conclusion that these lands would not compensate for the loss of the 206 acres of Refuge lands that were to be transferred to the State was arbitrary and capricious.

First, plaintiffs contend that the Secretary's position that the offered lands would not compensate for the loss of the 206 acres was contrary to the position taken by the FWS in 1998. In March 1998, the FWS issued a Land Protection Plan for the Izembek National Wildlife Refuge Complex.[78] In the Land Protection Plan, the FWS identified the 2,604 acres of land between Kinzarof Lagoon and the 8,092 acres of land at Mortensen's Lagoon, both of which were part of the offered lands, as "High Priority" for addition to the Izembek and Alaska Peninsula National Wildlife Refuges.[79] The Land Protection Plan explained that the FWS was interested in acquiring these lands because

> [h]uman activity or development on private lands can compromise the wilderness character of adjacent refuge lands. Currently, most of the large private inholdings adjacent to designated wilderness areas continue to meet Federal criteria for designation as wilderness should these lands be reacquired. However, the wilderness character of the land has the potential to be altered by actions of the landowners. Future activities on these lands may also conflict with adjacent wilderness resource values on refuge lands.
>
> * * *
>
> The remoteness and limited access of much of the private land in the Izembek Complex lessens its suitability for development. However, there is the potential for development on non-Federal lands within the refuge boundary.... [T]here is the potential for negative impacts on refuge wildlife populations if increasing numbers of recreational cabins and commercial

---

[78]Admin. Rec. at 235435.

[79]Admin. Rec. at 235485.

> lodges are constructed on private lands and public use contin-
> ues to increase.[80]

Plaintiffs argue that this position, that the offered lands had the potential for development, was contrary to the position that the Secretary took in the ROD, in which she stated that the offered lands "were not likely to be developed, if retained in their current ownership, in ways that would affect the same resources that would be affected by the construction and operation of a road through the Izembek Refuge."[81]  Plaintiffs argue that neither the FEIS nor the ROD provide any explanation for the contradictory statements regarding the private developmental pressures on the offered lands.  "To prevent a claim it was acting in an arbitrary or capricious manner, where an agency changes its policy, the agency must show awareness that it is changing a policy and give a reasoned explanation for the adoption of the new policy."  <u>Organized Vill. of Kake v. U.S. Dep't of Agric.</u>, 746 F.3d 970, 974 (9th Cir. 2014).  Plaintiffs argue that defendants have shown no awareness that they were changing the policy expressed in the Land Protection Plan and have given no explanation for the change.  Thus, plaintiffs argue that the Secretary's determination that the offered lands would not compensate for the loss of the 206 acres of Refuge land was arbitrary and capricious.

There was no change in policy here.  As defendants acknowledge, certain portions of the KCC's inholdings were identified in the Land Protection Plan as a priority for purchase.  But the proposed exchange of lands found by the Secretary to be ecologically unique to Izembek for KCC inholdings is an entirely different matter.  "The proposal to construct a road across both refuge and King Cove Corporation lands is currently the greatest known potential threat to wildlife and wilderness values within the Izembek

---

[80]Admin. Rec. at 235487.

[81]Admin. Rec. at 220115.

Complex."[82]  Plaintiffs emphasize they are arguing that the change in policy here was between there being a threat of development in 1998 to there being no threat of development in 2014, not a change in policy about building a road.  But in the ROD, the Secretary did not state that there was no threat of development of the offered lands, but rather that it was unlikely that the offered lands would be developed "in ways that would affect the same resources that would be affected by the construction and operation of a road through" the Refuge.[83]  The ROD does not change policy.  It evaluates a specific land use proposal for purposes of the OPLMA.

Plaintiffs next argue that the Secretary <u>assumed</u> that the offered lands were not likely to be developed, rather than taking a "hard look" to see if the offered lands were subject to development.  Plaintiffs contend that there is a State oil and gas leasing plan on a portion of the 41,887 acres the State would transfer to the Refuge; that the KCC has selection rights to 5,430 acres of land within the Wilderness that under Alternative 1 would be transferred to KCC and thus be subject to development but under the road alternatives would retain a Wilderness designation; that the foregoing 5,430 acres include 1,197 acres of Ramsar Convention Wetlands that would be removed from the Wilderness under Alternative 1; that under Alternative 1, the State would not transfer to the Izembek State Game Refuge 4,282 acres of submerged lands, 2,300 acres of eelgrass beds, and 17 miles of intertidal shoreline in the Kinzarof Lagoon; and that under Alternative 1, the KCC could continue to promote commercial recreation activities on the offered lands.  Plaintiffs also contend that the FEIS did not analyze the lands on Sitkinak Island to see how transferring that land to the State might benefit the National Wildlife Refuge System.  Plaintiffs contend that because the FWS and the Secretary failed to consider any of the above, they failed to

---

[82]Admin. Rec. at 235488.

[83]Admin. Rec. at 220115.

take the requisite "hard look" at an important aspect of the exchange, namely whether the offered lands were in fact subject to development.

The FWS took the required "hard look" at the reasonably foreseeable future actions, which would include development of the offered lands. The FEIS defined "reasonably foreseeable future actions" as

> those that are external to the proposed action, and likely (or reasonably certain) to occur, although they may be uncertain. Typically, they are based on documents such as existing plans, permit applications, and fiscal appropriations. Reasonably foreseeable future actions considered in the cumulative effects analysis consist of projects, actions, or developments that can be projected, with a reasonable degree of confidence, and for this analysis would occur over the next 5 to 10 years (from 2012 to 2022).[84]

In the FEIS, the FWS considered the "oil and gas resource potential" of the lands in question and noted that "[n]one of the proposed land exchange areas have experienced oil and gas exploration activity."[85] The record reflects that the State put out a call for information regarding a potential lease sale on October 12, 2012 (that included the state lands offered for exchange)[86] which drew little interest in development. Moreover, in their reply brief, plaintiffs concede that defendants are entitled to deference as to their conclusion that no oil or gas development was reasonably foreseeable on the offered lands.[87]

As for any other potential development, the FEIS adequately considered whether the offered lands would be subject to such development. Plaintiffs argue that if the offered lands were exchanged they would be protected as part of the Refuge, which is correct, and

---

[84]Admin. Rec. at 182078.

[85]Admin. Rec. at 181612.

[86]Admin. Rec. at 195012.

[87]Joint Reply at 19, Docket No. 86.

that they might be developed if they are not exchanged, which is also correct. But, plaintiffs have pointed to nothing in the record that suggests that any development is likely or foreseeable in the future.

Plaintiffs also argue that the Secretary failed to consider the wildlife and environmental value of the offered lands in any meaningful manner. They argue that the Secretary summarily dismissed the value of the offered lands because she had decided that the 206 acres of federal land was irreplaceable.

To the extent that plaintiffs are contending that the FWS only considered the impacts that the proposed project would have on the 206 acres of federal land, plaintiffs are wrong. The FWS found that "[t]he impact of road construction on wilderness character would radiate far beyond the footprint of the road corridor."[88] Moreover, the FWS properly considered the wildlife and environmental value of the offered lands in comparison to the 206 acres. For example, although some of the state and local parcels offered for exchange have notable environmental values, none are home to the unique population of Tundra Swans that reside in the isthmus.

It is the court's perception that plaintiffs' arguments that the FWS did not take a "hard look" at land values are simply disagreements as to the relative weight that the FWS accorded the impacts. For example, plaintiffs incorrectly claim that the analysis did not consider impacts of the No Action Alternative to wetlands that would not be added to federal ownership. But, as defendants point out, the FEIS states that under Alternative 2, "the federal government would gain approximately 12,726 acres of wetlands while relinquishing ownership of 993 acres of wetlands (980 acres of Sitkinak Island and 13 acres

---

[88]Admin. Rec. at 220115; see also, Admin. Rec. at 182376 ("[t]he cumulative impacts of increased human presence are far greater than those of road construction operation and maintenance with the combined disturbances potentially creating conditions conducive to an ecological trap or population sink for such species as Blank Brant and Emperor Goose"); Admin. Rec. at 181327 ("From the proposed corridor, nearly the entire wilderness is within a 20-mile range of most all-terrain vehicles").

in the road corridor)."[89]  The FEIS compared the value of these wetlands with the value of the wetlands that would be given up.[90]  The FEIS also discussed the impacts of the No Action Alternative on the submerged lands in the Kinzarof Lagoon, noting that "they are subject to less protection than lands within National Wildlife Refuges."[91]  And, the FEIS discussed Sitkinak Island and the impacts to the Island under the various alternatives.[92]

Plaintiffs next argue that defendants made an incorrect assumption as to how the KCC would have to manage its selected lands.  As mentioned above, KCC has selection rights to 5,430 acres of land within the Refuge.  In the FEIS, the KCC selection rights were mentioned, and the FWS stated that once the lands were conveyed, KCC "would then control the land use, subject to the provisions of ANCSA Section 22(g).  This provision requires that King Cove Corporation would manage its land in such a way that no adverse effects result on the adjacent lands of the Izembek National Wildlife Refuge."[93]  The FEIS stated that any development of the selected lands by KCC would be "subject to a compatibility determination by the Izembek national Wildlife Refuge manager...."[94]

Section 22(g) of ANCSA provides:

> If a patent is issued to any Village Corporation for land in the National Wildlife Refuge System, the patent shall reserve to the United States the right of first refusal if the land is ever sold by the Village Corporation. Notwithstanding any other provision of this chapter, every patent issued by the Secretary pursuant to this chapter--which covers lands lying within the boundaries of a National Wildlife Refuge on December 18, 1971, shall contain a provision that such lands remain subject to the laws

---

[89]Admin. Rec. at 181241.

[90]Admin. Rec. at 181706-08.

[91]Admin. Rec. at 181319.

[92]Admin. Rec. at 181317-18.

[93]Admin. Rec. at 181147.

[94]Admin. Rec. at 181147.

and regulations governing use and development of such Refuge.

43 U.S.C. § 1621(g).

The FWS's analysis was correct. The use of the KCC selected lands would be subject to a compatibility determination by the Refuge manager and these lands must be managed in a way that is consistent with the purpose of the surrounding refuge. The FWS did not make any incorrect assumptions as to the application of Section 22(g) of ANCSA to the KCC selected lands.

Finally, plaintiffs argue that the FWS did not take the same hard look at the foreseeable consequences of the No Action Alternative as it did for the consequences of the road alternatives. As an example, plaintiffs contend that defendants took a hard look at projected illegal use of all-terrain vehicles in the Refuge in connection with Alternative 3.[95] But, plaintiffs contend that defendants did not apply the projected ATV travel corridors to 1) the 5,430 acres of KCC land that would not be transferred to the Izembek Wilderness and would therefore be open to ATV activity under the No Action Alternative; 2) the 2,604-acre Kinzarof Lagoon parcel that would be protected from ATV traffic if the land exchange occurred but would not be protected under the No Action Alternative; or 3) the 8,092-acre Mortensen's Lagoon parcel that would be protected under the road alternatives but not the No Action Alternative. As a second example, plaintiffs contend that defendants did not consider the reasonably foreseeable consequences of KCC's announced future development plans for the 1,917 acres of Ramsar wetlands which are part of the KCC's selected lands or future uses that could reasonably occur on the 8,092-acre Mortensen's Lagoon parcel.

The FWS or the Secretary did not undervalue the offered lands, nor did they analyze the value of these lands in a manner different from that used for the 206 acres. They took the required "hard look" at the land exchange values. Plaintiffs did not like the outcome

---

[95]Admin. Rec. at 181439-40.

of the comparison of value made here, but that does not mean that the FWS or the Secretary acted in an arbitrary or capricious manner.

Washburn Report

Plaintiffs argue that it was a violation of NEPA that the Washburn Report did not make a recommendation regarding the need for the road for medical evacuation purposes. Plaintiffs also seem to be suggesting that the Washburn Report failed to adequately discuss whether there was a need for the road for medical evacuations. Plaintiffs' contention that Washburn was required to make a recommendation is premised on the March 21, 2013 memo from the Secretary to Washburn in which the Secretary stated that "[t]he information gathered from the Assistant Secretary's report and the Secretary's official visit will be used as part of the Secretary's determination on the proposed land exchange/road corridor under the 2009 Act."[96] Plaintiffs contend that the Secretary "volunteered" that the Washburn Report would include a recommendation that would be used in the NEPA process. Because the Washburn Report failed to make a recommendation, plaintiffs argue that NEPA was violated.

The Washburn Report was used in the NEPA analysis as evidenced by the fact that the Secretary cited to the report in the ROD and the report was attached as an exhibit to the ROD. The report discussed the need for the road for medical evacuation purposes, which is all it was required to do. Nothing in the Secretary's memorandum required that Washburn make a recommendation as to the ultimate question of which alternative should be chosen. There was not NEPA violation.

Conclusion

In the OPLMA Congress recognized that a road from King Cove to Cold Bay would foster public health and safety and would present environmental concerns. Rather than

---

[96]Admin. Rec. at 235533.

make the hard choice between public health and safety and the environment itself, Congress left that decision to the Secretary, requiring that she comply with NEPA before approving the road and land exchange needed to construct the road. Given the sensitive nature of the portion of the Izembek Wildlife Refuge which the road would cross, the NEPA requirement for approval of the proposed road probably doomed the project. Under NEPA, the Secretary evaluated environmental impacts, not public health and safety impacts. Perhaps Congress will now think better of its decision to encumber the King Cove Road project with a NEPA requirement.

Plaintiffs' and intervenor-plaintiff's motion for summary judgment is denied, and defendants' and intervenor-defendants' cross-motions are granted. There has been no NEPA violation here, nor has there been any violation of the OPLMA. The clerk of court shall enter judgment dismissing plaintiffs' and intervenor-plaintiff's complaints with prejudice.

DATED at Anchorage, Alaska, this 8th day of September, 2015.

/s/ H. Russel Holland
United States District Judge

## Appendix of Acronyms

| | |
|---|---|
| AEB | Aleutians East Borough |
| ANILCA | Alaska National Interest Lands Conservation Act |
| ANCSA | Alaska Native Claims Settlement Act |
| APA | Administrative Procedure Act |
| AS-IA | Assistant-Secretary of Indian Affairs |
| ATV | All-Terrain Vehicle |
| CEQ | Council on Environmental Quality |
| DEIS | Draft Environmental Impact Statement |
| DOI | Department of Interior |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FWS | Fish and Wildlife Service |
| IHS | Indian Health Service |
| KCC | King Cove Corporation |
| KGC | King Cove Group |
| NEPA | National Environmental Policy Act |
| MOU | Memorandum of Understanding |
| OPLMA | Omnibus Public Land Management Act |
| PDEIS | Preliminary Draft Environmental Impact Statement |
| PFEIS | Preliminary Final Environmental Impact Statement |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |